### In re MANCHESTER HIDES, INC., Debtor.

**Daniel P. ERNST, Trustee in Bankruptcy of Manchester Hides, Inc., and First Wisconsin Financial Corporation, Plaintiffs,**

v.

**OHSMAN & SONS, COMPANY, INC., and Ohsman International Corp., Defendants.**

**Bankruptcy No. 81–02178.**
**Adv. No. 81–0780.**

United States Bankruptcy Court, N.D. Iowa.

Jan. 25, 1985.

---

Sell also Bkrtcy., 32 B.R. 629.

Mark A. Cody, Dubuque, Iowa, for Daniel P. Ernst, trustee/plaintiff.

Gregory M. Lederer and Dennis McMenimen, Cedar Rapids, Iowa, for First Wisconsin Financial Corp.

Carroll J. Reasoner and Thomas P. Peffer, Cedar Rapids, Iowa, for defendants Ohsman.

Charles M. Peters, Cedar Rapids, Iowa, for plaintiffs.

Mark A. Cody, Dubuque, Iowa, Gregory M. Lederer and Charles M. Peters, Cedar Rapids, Iowa, for plaintiffs.

Carroll J. Reasoner and Thomas P. Peffer, Cedar Rapids, Iowa, for defendants.

*Findings of Fact, Conclusions of Law, and ORDERS, with Memorandum, re Turnover Complaint*

WILLIAM W. THINNES, Bankruptcy Judge.

The matter before the Court is a Turnover Complaint filed by Daniel P. Ernst, the duly appointed Trustee in *In re Manchester Hides, Inc.*, 45 B.R. 794, (hereinafter referred to as Debtor or Hides), and First Wisconsin Financial Corporation (FWFC) against Ohsman & Sons, Company (Sons) and Ohsman International Corp. (International).

Being fully advised and pursuant to Federal Rule of Bankruptcy Procedure 7052, the Court now makes its Findings of Fact, Conclusions of Law, Orders and Memorandum.

## FINDINGS OF FACT

1. Hides is an Illinois corporation formed on October 6, 1980. The officers of the corporation at its inception were Douglas Gowan, president; William Crissman, treasurer; Peter Porikos, secretary. The stock of Hides was owned 75% by Gowan and 25% by Crissman.

2. Hides purchased a hide processing plant in Manchester, Iowa, from Hide Service Corp. on or about December 9, 1980. This acquisition was financed in part by Hide Service Corp. in the amount of $300,-000.00 secured by a second mortgage on the real estate. The remainder of the acquisition was financed by FWFC. In January of 1981, Hides began to do business with both Sons and International. The transactions with International were all sales transactions in which International made purchases from the Debtor. The Debtor's transactions with Sons included both sales and purchases of hides. The Debtor's transactions with Sons and International began in January of 1981.

3. An Involuntary Petition in Bankruptcy was filed against the Debtor on June 16, 1981. The Debtor filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code on September 24, 1981. On October 5, 1981, Daniel P. Ernst was appointed as Trustee of the Chapter 11 proceeding. The Chapter 11 proceeding was voluntarily converted to a Chapter 7 proceeding on February 24, 1982. Daniel P. Ernst continued as trustee after the conversion of the case to a Chapter 7 bankruptcy.

4. FWFC financed the acquisition of the hide processing plant by the Debtor in December of 1980. The Debtor and FWFC entered into an inventory and accounts receivable loan agreement on December 3, 1980. As a part of that loan package, FWFC agreed to make loans of up to 80% of the amount owing on the "qualified accounts" as well as loans on inventory of the Debtor. Under the agreement between FWFC and the Debtor, a "qualified account" was an account receivable in which

the party owing the money to the Debtor had agreed not to set off amounts owed to the Debtor against amounts owed to the party by the Debtor.

5. On February 26, 1981, International signed a No Offset Agreement with Manchester Hides that included a termination date of March 30, 1981. On April 9, 1981, International signed a second No Offset Agreement which was to terminate on April 30, 1981, but the Debtor did not sign the April agreement. In addition, International signed a third No Offset Agreement on May 12, 1981, which included the words "this agreement is extended until June 30, 1981." The Debtor did not sign the May No Offset Agreement. The No Offset Agreements were prepared by FWFC with the exception of the termination language which was added by International. FWFC never expressed any displeasure to International over the addition of the termination language to the No Offset Agreements.

6. FWFC loaned money to the Debtor utilizing the accounts receivable invoiced to International prior to the existence of the "No Offset Agreement." FWFC also looked to accounts invoiced to International during the periods of time during which no such agreement was binding, namely, March 30–April 9 and April 30 to May 12, 1981.

7. First Wisconsin has a valid first priority security interest in the prepetition accounts receivable of the Debtor in excess of $100,000.00.

8. Sons is an Iowa corporation formed September 25, 1923, with its principal place of business at 122–130 B Avenue N.E., Cedar Rapids, Iowa. The shareholders of Sons are Eugene K. "Bud" Ohsman and Herman Ohsman. The directors are Eugene K. "Bud" Ohsman, Herman Ohsman, and Michael Stuart Ohsman. The officers of Sons are Herman Ohsman, president, Eugene K. "Bud" Ohsman, vice president, and Michael Stuart Ohsman, treasurer/secretary.

9. Sons is engaged in the buying and selling of hides, furs and wools, storing and sorting, some processing, and some skinning of furs. Between January 1, 1981, and June 30, 1981, Sons sold hides to the Debtor and Sons bought hides from the Debtor. In some instances, Sons acts as a broker, arranging sales transactions between two known third parties; in others, it acts as a dealer, buying hides, furs, and wool to hold for sale to an unknown third party. Sons is owed in excess of $100,000.00 by the Debtor.

10. International is an Iowa corporation formed in September of 1975 with its principal place of business at 122–130 B Avenue N.E., Cedar Rapids, Iowa. The current shareholder of International is Sons. The directors of International are Eugene K. "Bud" Ohsman, Herman Ohsman, and Michael Ohsman. The officers are Herman Ohsman, president, Eugene K. "Bud" Ohsman, vice president, Michael Stuart Ohsman, treasurer/secretary. International is a DISC (Domestic International Sales Corporation) under the provisions of the Internal Revenue Code. Sons and International maintain separate books and records, file separate tax returns, and file separate annual corporation reports with the Secretary of the State of Iowa.

11. International has no paid employees of its own. Employees of Sons perform work for International. For the services provided International pays a fee to Sons. International owns no assets other than cash on hand and in the bank, current inventory, and accounts receivable.

12. International sells most of its goods to customers outside the boundaries of the United States of America, to other corporations which are DISC's, and to customers which certify to International that they will resell the hides to customers outside the boundaries of the United States.

13. The evidence reveals a course of dealing between Sons and the Debtor. Sons purchased hides from the Debtor and sold hides to the Debtor beginning in January of 1981 and continuing through June of 1981. The course of dealing between Sons and the Debtor for the purchase of hides from the Debtor by Sons was as follows:

Sons would reach an agreement with the Debtor for the purchase of hides; then, Sons would send a confirmation to the Debtor which the Debtor would sign and return to Sons; after the confirmation was returned to Sons, the Debtor would ship the order to the party as requested by Sons. In all but two instances, the Debtor improperly invoiced International for the orders made by Sons. Sons then paid for the improperly invoiced orders.

14. There were 27 confirmations by Sons for purchases to be made by Sons with 26 of these confirmations having been accepted by the Debtor. Of these 27 transactions, Sons made payment on 21 while International made payment on 6 transactions. The 21 transactions in which Sons sent the confirmations and paid the invoices were completed from January 26, 1981, through April 29, 1981, and totaled $472,115.94. The six transactions in which International made payments to the Debtor on orders placed by Sons during this period of time totaled $140,746.53.

15. International's course of purchases with the Debtor was similar to that of Sons in that confirmations of purchases by International from the Debtor were sent to Hides. The evidence reflects that six confirmations were sent by International to the Debtor and two were signed and returned by the Debtor to International. The Debtor properly invoiced seven transactions to International for which International made payments to the Debtor of $170,500.09. These transactions spanned the period from January of 1981 through March of 1981.

16. The record reflects numerous other confirmations sent by Sons to the Debtor but only reveals that the previously mentioned transactions were fulfilled by the Debtor and paid by Sons.

17. The subject of the controversy among the parties are four invoices totaling $95,446.88 representing the amount due the Debtor for the sale of processed hides to Sons. The base order of each of the invoices was made by Sons and confirmed by Hides. Three of the orders were improperly invoiced to International while the fourth was properly invoiced to Sons.

18. In the original Complaint, the Trustee sought recovery in the above and additional amounts from Sons. Pursuant to this Court's Order granting a motion to amend, FWFC joined as a party-plaintiff and International joined as a party-defendant. In the Amended Complaint, the Trustee and FWFC sought recovery on three counts: (I) Judgment against International in the amount of $69,312.96 representing the account due the Debtor for purchase of certain goods and services; (II) Judgment against Sons in the amount of $95,067.92, representing the account due the Debtor for purchase of certain goods and services; and (III) Judgment against International in the amount of $95,067.92 representing damages from an alleged misrepresentation.

19. Sons and International in their Answer to the Amended Complaint denied all material allegations. In addition, with respect to Counts I and III, International, via an affirmative defense, asserted that Sons, not International, was involved in the transactions concerning the $69,312.96 account due. With respect to Count II, Sons responded with two affirmative defenses: First, the Debtor was indebted to Sons in the amount of $538,395.55, which amount may be validly offset against the $95,067.92 due the Debtor; and second, the No Offset Agreement relied upon by FWFC expired on June 30, 1981, and thus was of no aid to FWFC's claim. In addition, Sons requested that this Court lift the automatic stay so that it could proceed with a setoff of the amounts due it against the amounts owed to the Debtor.

## CONCLUSIONS OF LAW

1. The Court concludes that Sons and International are separate, distinct corporate entities and that an agreement signed by one is not effective against the other.

2. International did not misrepresent the character of its business relation with the Debtor in the No Offset Agree-

ment as that agreement was prepared by First Wisconsin and stated that it was First Wisconsin's understanding that International was both buying hides from the Debtor and selling hides to the Debtor.

■ 3. Even if a misrepresentation occurred with respect to the character of the business transaction between International and Hides when No Offset Agreement was signed, such misrepresentation was not material as First Wisconsin continued to loan money to the Debtor on the Debtor's accounts receivable from International even when there was not a No Offset Agreement in force. Therefore, those portions of the amended turnover complaint alleging misrepresentation must be dismissed.

■ 4. The course of dealing between both Sons and International with the Debtor was such that agreements were reached between the parties with either Sons or International sending an immediate confirmation of the agreement to the Debtor. In many instances, the Debtor accepted the confirmation as sent by either Sons or International. In reality, the contracts between the parties and the Debtor were made prior to the written confirmation. The confirmations with their signed acceptances by the Debtor constitute merely written memorializations of previously entered contracts. Therefore, the fact that any given transaction was later misinvoiced by the Debtor has no effect upon which entity, Sons or International, was the proper party to pay for the goods delivered pursuant to an invoice.

■ 5. Each of the four invoices in question constitutes a pre-petition obligation of Sons to the Debtor. Since, there is no evidence in the record to show that the four transactions in question were entered into by Sons for the purpose of allowing it to be in a position to exercise a setoff and, since more money is owed to Sons by the Debtor than Sons owes Debtor, Sons has a valid right of setoff of the amounts owed to the Debtor.

■ 6. First Wisconsin and the Trustee have failed to meet their burden of proof

that adequate protection has been afforded to Sons such that Sons should be precluded from exercising its right of setoff.

7. The Trustee and First Wisconsin have not met their burden of proof to establish their entitlement to the monies owed to the Debtor and therefore the turnover complaint must be dismissed by this Court as a matter of law.

8. Sons is entitled to have the automatic stay imposed by 11 U.S.C. § 362(a) lifted so that it may proceed to set off the amounts it owes the Debtor against the amounts Debtor owes it.

## ORDERS

IT IS HEREBY ORDERED that each and every count of Plaintiffs' Complaint against Defendants is overruled in its entirety with the Plaintiffs being entitled to no recovery from Defendants.

IT IS FURTHER ORDERED that the automatic stay provided by 11 U.S.C. § 362(a) is hereby lifted as to Defendant Sons and Sons is hereby expressly authorized to exercise its right of setoff pursuant to 11 U.S.C. § 553(a).

IT IS FURTHER ORDERED that the costs of this action shall be fully assessed to Plaintiff First Wisconsin Financial Corporation.

## MEMORANDUM

### I. *Piercing the Veil*

In *Northwestern National Bank v. Metro Center, Inc.,* 303 N.W.2d 395, 398 (Iowa 1981), the Iowa Supreme Court observed that "central to corporate law is the concept that a corporation is an entity separate and distinct from its shareholders." This concept is, however, subject to the rule that "the corporate device cannot in all cases insulate the owners from personal liability." *Briggs Transportation Co., Inc. v. Starr Sales Co., Inc.,* 262 N.W.2d 805, 809–10 (Iowa 1979). Interpreting this "pierce the corporate veil" doctrine in Iowa, the Eighth Circuit found the following determinative factors:

[A] corporation's existence is presumed to be separate, but can be disregarded if (1) the corporation is undercapitalized, (2) without separate books, (3) its finances are not kept separate from individual finances, individual obligations are paid by the corporation, (4) the corporation is used to promote fraud or illegality, (5) corporate formalities are not followed or (6) the corporation is merely a sham. *Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Management, Inc.,* 519 F.2d 634, 638 (8th Cir.1978); accord, e.g., *Darling Stores Corp. v. Young Realty Co.,* 121 F.2d 112, 116 (8th Cir.1941) (applying Iowa law); *Northwestern National Bank,* 303 N.W.2d at 398–99; *Team Central, Inc. v. Teamco, Inc.,* 271 N.W.2d 914, 923 (Iowa 1978); *Briggs Transportation Co.,* 262 N.W.2d at 810. More particularly, "[I]n the parent-subsidiary context [the Iowa Supreme Court has] stated the corporate entity should be disregarded where doing so would prevent the parent from perpetuating a fraud or injustice, evading just responsibility for defeating public convenience." *Briggs Transportation Co.,* 262 N.W.2d at 810. In the case at bar, FWFC contends that "International and Sons should be treated as one entity for purposes of liability to third parties." The issue, therefore, is whether International's corporate veil should be disregarded so that the "No Offset Agreement" may operate to bind Sons. To resolve this question of fact, the Court turns to the Stipulation and testimony adduced at the hearing. *See Team Central,* 271 N.W.2d at 923.

As indicated earlier, International was incorporated for the purpose of taking advantage of the DISC regulations in the Internal Revenue Code. It was formed as a "wholly-owned" subsidiary of Sons.[1] Its sole shareholder is Sons. The shares of Sons, on the other hand, are held by two individuals. Three individuals act as Directors and Officers of Sons. These same individuals are also International's Officers and Directors. Sons and International maintained separate books and records and filed separate tax returns and separate annual corporation reports.[2]

FWFC's main contention is based on the manner of transactions among Sons, International, and the Debtor. At various times Sons sold "green" hides to the Debtor for processing. After the hides had been processed, Sons would purchase them from the Debtor for resale. When a qualified DISC buyer of processed hides was located, however, Sons would act as a broker by first buying the processed hides from the Debtor and then selling them to International, which in turn would sell to the qualified DISC buyer.

Testimony adduced by FWFC reveals that International had no employees or inventory. Indeed, business transactions between International and the Debtor were effected by Sons' employees. When Sons acted as a broker for International, it handled all shipping and billing. However, whenever International did business with the Debtor, the transactions were channeled through International's, not Sons', checking account. Indeed, Sons as broker would send invoices to International, which would then pay Sons via International's account.

Focusing on the "No Offset Agreement", the Agreement on its face referred only to International. Nowhere in the Agreement was Sons mentioned. Eugene Ohsman, International's vice president, testified that when the Agreement was signed, no one intended to forego Sons' right to set-off.[3] This testimony was unrebutted.

1. *See* Exhibit N.

2. *See* Stipulation at p. 3–4.

3. The Parol Evidence Rule may operate to bar testimony relating to the Agreement. As stated by the Iowa Supreme Court in *Tamm, Inc. v. Pildis,* 249 N.W.2d 823, 831 (Iowa 1976), the Rule excludes testimony when it is offered to vary or contradict the terms of an integrated contract. *Accord Egan v. Egan,* 212 N.W.2d 461, 464 (Iowa 1973). The Rule, however, "is not violated when extrinsic evidence is received to assist the local court in determining the meaning of contractual language." *Westway Trading Corp. v. River Terminal Corp.,* 314

Application of the *Lakota Girl Scout Council* test to the above facts convinces this Court that Sons and International are two separate and distinct entities. First, no evidence was produced to demonstrate that International was undercapitalized. Second, the evidence showed International and Sons kept separate books. Third, Sons' and International's finances are kept separately. Indeed, International transacted business via its own checking account whereas Sons transacted business via a different checking account.[4] Fourth, International was formed to take advantage of favorable DISC regulations, not to promote fraud or illegality. Fifth, there was no evidence indicating that International did not follow corporate formalities. Last, International is not a mere shell or sham. While the same three individuals managed International as well as Sons, "mere identity of stock ownership and corporate management is not alone sufficient to permit a piercing of the corporate veil." *Team Central*, 271 N.W.2d at 923. Further, given its unique posture within the Internal Revenue Code and the existence of a SEPARATE checking account International had a valid life that breathed independently. Moreover, no evidence was adduced to show that perpetration of fraud or injustice or evasion of responsibility would ensue if the corporate veils were kept intact. *Briggs Transportation Co.*, 262 N.W.2d at 810.

In sum, this Court concludes that FWFC's piercing the veil argument should be rejected.[5]

## II. *"No Offset Agreement"*

First Wisconsin and the Trustee contend that Sons should be bound by the No Offset Agreement signed by International. These parties also contend that International intentionally misrepresented its business dealings with Hides when it executed the No Offset Agreement. The No Offset Agreement was drafted by Nolan Zadra, vice president and associate general counsel of First Wisconsin. It was forwarded to Ohsman International via letter.

This letter, addressed to Ohsman International, stated in the first paragraph that it was First Wisconsin's understanding that International was buying hides from the Debtor and selling hides to the Debtor. The testimony at trial revealed that Bud Ohsman was told by Mr. Dennis Gowan, president of the Debtor, that he needed this agreement signed so that Hides could do business with International and receive loans on the accounts receivable. Ohsman testified that he was willing to forego the right to offset any amounts due International from Hides against amounts International might owe Hides and that he was not willing to do so with respect to Sons. He further testified that this was due to the fact that Sons would be doing more business with Hides than would International. Prior to signing the No Offset Agreement, Ohsman added the term that the agreement would terminate on March 30, 1981. He then signed the agreement on February 26, 1981, and the same was signed on behalf of Manchester Hides by Dennis Gowan. The No Offset Agreement was signed again by Bud Ohsman for Ohsman Interna-

---

N.W.2d 398, 402 (Iowa 1982); *Terrell v. Star Coal Co.*, 327 N.W.2d 771, 773 (Iowa App.1982). The parties in their Pretrial Statement of Issues indicated that a Parol Evidence objection may be raised at trial. No such objection was raised at trial, however, when Eugene Ohsman's testimony was proffered. Whether Eugene Ohsman's testimony violated the Parol Evidence Rule and thus should not be admitted is therefore not at issue before this Court. *Cf. Bond v. Local Union 823*, 521 F.2d 5, 10–11 (8th Cir. 1975) (parol evidence objection waived when no offer of proof was tendered).

**4.** *Compare* Exhibit L *with* Exhibit M.

**5.** FWFC also contends that Sons and International should be "estopped from denying their separate existences." FWFC Trial Brief at 18. Assuming, without deciding, that the elements of estoppel have been proven, *see id.* at 18–19, FWFC nonetheless bears the burden to demonstrate facts that would justify piercing the corporate veil. *See* 1 *Fletcher Cyc Corp.* § 41.30, at 431 (Perm. ed. 1983). As this Court has just concluded that the FWFC failed to demonstrate the factors for piercing the veil, the question of estoppel is irrelevant and will not be discussed.

tional on April 9 and May 12 and it included language terminating the agreement on April 30 and then extending the agreement until June 30 when it was signed on these subsequent dates.[6] Hides never signed the subsequent No Offset Agreements. At no time did First Wisconsin make any statement to International that it disagreed with the termination language added to the document by International.

The effect of the No Offset Agreement entered into between International and Hides was to make the accounts owed by International to Hides "qualified accounts" as defined in the receivables and inventory loan security agreement entered into between First Wisconsin Financial Corporation and Manchester Hides, Inc., on December 3, 1980.[7] In the receivables and inventory agreement between First Wisconsin and Hides, First Wisconsin agreed to make loans on up to 80% of the fixed value of Hides' qualified accounts.

Having previously refused to pierce the corporate veil separating the distinct entities of Sons and International, it is easy for this Court to conclude that the No Offset Agreement is of no force and effect against Sons. However, this still leaves the Court with a question regarding the effect of the No Offset Agreement between International and Hides for the three invoices covering orders made by Sons, confirmed by Sons, and accepted by Hides, and invoiced, improperly, to International.

■ It is basic contract law that a contract is formed when an offer is made and accepted by the second party. The later invoicing, or misinvoicing, of the transaction by one of the parties does not change the character of the contract. As has been pointed out previously, the course of dealing between Sons and Hides was as follows: An agreement would be reached for the purchase of hides from the Debtor; Sons would send a confirmation to the Debtor at its office in Milwaukee; the Debtor, in every instance except one, would sign the confirmation forwarded to it by Sons and return it to Sons; thereafter, the Debtor would ship the hides as directed by Sons and misinvoice the loads of hides to International; finally, after receipt of the improper invoice by International, Sons would make payment to the Debtor.

■ The evidence reveals that during the course of dealing between Sons and the Debtor from January through June of 1981, 31 transactions were confirmed by Sons with the Debtor accepting the confirmations as sent by Sons in all but one case. Of these transactions, all but two were *improperly invoiced to International.* On six occasions, International made payment for products which originally had been ordered by Sons. The dollar amounts of these transactions have been previously set forth in the Findings of Fact. The Court finds that the payment on six invoices by International on orders made by Sons was not the usual course of dealing and does not justify disregarding the established customary course of dealing between Sons and the Debtor. Having examined the course of dealings between the parties, the Court will now turn to the effect of this course of dealing upon the claim of FWFC and the Trustee that International owes the sums set forth on the three invoices to the Debtor.

It is a basic tenet of contract law that when an offer is made and accepted by another party, a contract is formed. The course of dealing by the parties reveals that contracts were routinely made by Sons for the purchase of hides from the Debtor, confirmed by Sons with the confirmation being accepted by the Debtor. As soon as the agreement was reached by Sons and the Debtor, a contract was formed. The confirmations were a written memorialization of the terms of the agreement as reached by Sons and the Debtor. It would be inequitable for this Court to conclude that the misinvoicing of the accounts receivable by the Debtor would make International liable for the debts of Sons. Since

---

**6.** *See* Exhibit E.

**7.** *See* Exhibit O at p. 1.

the agreements were initially reached between Sons and the Debtor, these are amounts owed by Sons and not by International. Therefore, the No Offset Agreement is of no force and effect with respect to the three improperly invoiced transactions which are a part of the controversy in the case at bar.

### III.  *Fraudulent Misrepresentation*

FWFC and the Trustee contend that International is guilty of fraudulent misrepresentation with respect to the No Offset Agreement if at the time the Agreement was reached, International was not selling hides to the Debtor.  The Trustee and FWFC further claim that International augmented its fraudulent misrepresentation by failing to inform the Debtor that the Debtor was misinvoicing the orders placed by Sons.  Based upon these claims of misrepresentations on the part of International, FWFC and the Trustee seek to estop International from disavowing the debts of Sons.  The Court feels that use of such circuitous illogic to reach the result of estoppel is unwarranted in this case.

In actions for fraudulent misrepresentation, Plaintiffs have the burden of proving by a preponderance of clear, satisfactory, and convincing evidence the following elements: (1) a material misrepresentation; (2) made knowingly; (3) with intent to induce the plaintiff to act or refrain from acting; (4) with plaintiff justifiably relying upon said misrepresentation; and (5) with resulting injury and damages to the plaintiff.  *Sedco Intern., S.A. v. Cory,* 522 F.Supp. 254, 322 (S.D.Iowa 1981), *aff'd,* 683 F.2d 1201 (8th Cir.1982); *Beeck v. Kapalis,* 302 N.W.2d 90, 94 (Iowa 1981); *Restatement* (Second) *of Torts,* § 525 (1977).

In this case the Court need not determine whether International made a material misrepresentation to FWFC when it signed the No Offset Agreement in which the first sentence stated, "It is our understanding that Manchester Hides, Inc., purchases 'green' hides from your company Oshman [sic] International Corp., and also sells hides to you."  Assuming *arguendo* that such a statement was a material misrepresentation on the part of International, the other elements necessary to prove fraudulent misrepresentation have not been proven by the Plaintiffs.  Specifically, the Plaintiffs have failed to prove that there was any justifiable reliance or, indeed, any reliance whatsoever upon alleged misrepresentation by FWFC.  The record clearly reflects that FWFC made loans to the Debtor based upon the accounts receivable owed by International to the Debtor before the No Offset Agreement was signed and during the time periods that no No Offset Agreement was in effect, namely, March 31 through April 9 and May 1 through May 12, 1981.[8]

In addition to the failure of the Plaintiffs to prove justifiable reliance, they have also failed to prove that the alleged misrepresentation was made with scienter or intent to induce the Plaintiffs to act or refrain from acting.  In this instance, International would have had to knowingly make the alleged misrepresentation intending to induce First Wisconsin to loan money on the "qualified accounts".  International had no knowledge of what First Wisconsin intended to do with respect to the advancement of funds to the Debtor.

The evidence as a whole argues against a conclusion by this Court that there was any fraudulent misrepresentation on the part of International.  The evidence also belies a conclusion that International was under any duty to inform the Debtor of the misinvoicing of the transactions between Debtor and Sons.  It appears from the evidence adduced at trial that if, indeed, there was any misrepresentation involved in the transactions of which First Wisconsin was a party, the misrepresentation was on the part of the Debtor, not International or Sons.  It is plausible to conclude that the Debtor knew that Sons would not consent to a No Offset Agreement.  Therefore, the Debtor only sought to have International

---

**8.**  *See* Exhibits F and G.

execute the No Offset Agreement. Given that First Wisconsin had agreed to make loans on "qualified accounts", misinvoicing the accounts to International rather than properly invoicing them to Sons would provide a convenient basis for the Debtor to obtain additional funds from First Wisconsin.

The Court notes that the receivables and inventory loan and security agreement executed between First Wisconsin and the Debtor gave First Wisconsin the right to examine the collateral and Debtor's records pertaining to it, wherever located, and to make copies of the records and further required the Debtor to assist FWFC in so doing.[9] The Court further notes that all of the confirmations from Sons to the Debtor indicates that Debtor, Manchester Hides, Inc., had a Milwaukee address.[10] The principal offices of First Wisconsin are also located in Milwaukee, Wisconsin. Given the fact that First Wisconsin had the right to inspect the collateral, in this case, accounts receivable, at any time, and the fact that the records of the accounts receivable were maintained by the Debtor in Milwaukee, First Wisconsin could easily have protected itself from any misrepresentation by the Debtor which may have taken place by availing itself of its rights under the receivables and inventory loan and security agreement.

International was never under any duty to inform the Debtor of any misinvoicing. In addition, International was also under no duty to First Wisconsin with respect to the misinvoicing. The Debtor may well have had an obligation to First Wisconsin not to misinvoice accounts receivable, but its failure to properly invoice the accounts receivable in no way estops International from denying that the debts incurred by Sons are indeed debts owed by Sons. Therefore, the Court concludes that the claims of the Plaintiffs regarding fraudulent misrepresentation and estoppel are groundless and should be dismissed.

## IV. *Vacation of the Automatic Stay*

As a part of the counterclaim by Sons, Sons requested that this Court lift the automatic stay imposed by 11 U.S.C. § 362(a). The purpose of lifting the stay in this instance is to allow Sons to exercise its right of offset as provided in 11 U.S.C. § 553(a). As has been stipulated by the parties, Sons is owed in excess of $100,000 by the Debtor. The total of the four invoices in question which are all debts of Sons is $95,-446.88. There is no equity in these accounts for the Trustee as they are either subject to setoff by Sons or are property securing the indebtedness of the Debtor to First Wisconsin Financial Corporation. Section 362(d) provides the framework for lifting the automatic stay. The evidence adduced at trial proves that there is no equity in the four accounts receivable and further that these are not necessary for an effective reorganization. Therefore, sufficient grounds exist for lifting the stay pursuant to 11 U.S.C. § 362(d)(2). In addition, there was no offer of adequate protection for the interests of Sons adduced at trial. Therefore, the Court concludes that grounds for lifting the automatic stay also exist under 11 U.S.C. § 362(d)(1).

## V. *Propriety of Setoff*

Sons claims that it is entitled to set off the amount which it owes Debtor from the amounts which it is owed by virtue of 11 U.S.C. § 553(a). Having examined the stipulation of the parties regarding the amount of debt owed to Sons by the Debtor and the total of the claim of the Debtor against Sons, the four invoices in question, the Court concludes that Sons is entitled to exercise its right of setoff. The only possible exception to Sons' right of setoff is found in 11 U.S.C. § 553(a)(3) which provides a conjunctive test for determining that a creditor is not entitled to exercise its right of setoff. This exception precludes a creditor from exercising the right of setoff if the debt owed to the debtor by the creditor was incurred by the creditor while the

---

**9.** *See* Exhibit O.

**10.** *See* Exhibits L and M.

debtor was insolvent *and* for the purpose of obtaining a right of setoff against the debtor. The record is void of any evidence from which the Court could conclude that Sons incurred its obligation under the four invoices in question for the purpose of obtaining a right of setoff against the Debtor. The evidence points to the opposite conclusion in that there was an active course of dealing between Sons and the Debtor. This course of dealing had begun in January of 1981, shortly after the Debtor began doing business. In addition, there was an ongoing course of dealing between the Debtor and Sons. This was a two-way course of dealing with numerous transactions between Sons and the Debtor. While there is no question that the Debtor was indeed insolvent at the time these obligations were incurred by Sons, there is no proof they were incurred for the purpose of obtaining a right of setoff against the Debtor. Therefore, the Court is compelled to conclude that Sons is entitled to exercise its right of setoff.