BRIGGS TRANSPORTATION CO., INC., Appellee,

v.

STARR SALES CO., INC., et al., Appellants.

No. 59158.

Supreme Court of Iowa.

Feb. 22, 1978.

John C. Platt of Chipokas, Koehler, Platt & Merrifield, Cedar Rapids, for appellants.

Michael P. Donohue of Moyer & Bergman, Cedar Rapids, for appellee.

Considered by MOORE, C. J., and MASON, REES, REYNOLDSON and McCORMICK, JJ.

REYNOLDSON, Justice.

The question in this appeal is whether a corporate veil should be pierced and corporate officers-owners held liable for corporate debt and punitive damages.

Defendant corporation Starr Sales Co., Inc., was organized by defendant Scott Voeltz and his parents, defendants Robert and Martha Voeltz, in October, 1974.

October 8, 1974, Scott telephoned Schulze, president of Northern State Sales Co., expressing Starr Sales' interest in purchasing certain television, radio, stereo and related equipment from Northern State. The latter company forwarded a credit application to Starr Sales. Upon return it was signed by Robert as president and disclosed a $197,851 net worth. The enumerated assets were actually those of another business owned by Robert, Play-Mar Lounge. A Dun & Bradstreet report relating to Starr Sales was received by Northern State. It identified Robert as president and secretary, Martha as vice-president and treasurer. A portion of the "history" stated: "Incorporated Iowa, Oct 25 1974. * * * Ownership acknowledged verbally by Robert L. Voeltz, president on Nov 1 1974. Business started Jan 1973 by Robert and Martha Voeltz." The net worth shown was the same as that incorporated in the Starr Sales credit report signed by Robert.

Northern State's credit investigation of Starr Sales revealed Scott had filed for bankruptcy. Because the value of goods sought was $17,612.33, Northern State was willing to make delivery and gamble freight expense, but demanded a C.O.D. arrangement.

Much of the negotiation had been between Schulze of Northern State and Scott. But on October 31, 1974, Schulze telephoned Robert and outlined the agreed terms of

sale. The merchandise was to be shipped pursuant to a bill of lading and sight draft arrangement through Peoples Bank & Trust Co. of Cedar Rapids, to insure payment on delivery. Robert replied, "I will talk to Scott about it and he will get in touch with you." The next day, November 1, Scott, in a telephone conversation with Schulze, reported his father had approved the deal as negotiated.

November 4, 1974, the goods were shipped through plaintiff carrier, Briggs Transportation Co. Briggs made an error on the bill of lading. Instead of receiving the sight draft properly endorsed, Briggs' employees collected only freight charges from Scott.

Briggs' supervisors in Cedar Rapids, notified of the error, went to the building (owned by Robert) where the goods had been delivered. Through a glass door they could see the equipment in the locked premises. They attempted to talk to Robert in his Play-Mar Lounge, located next door but in the same building. He was evasive, asserted he knew nothing about the shipment and wanted no part of it. A third person was seated at the bar with an unopened box containing a television set which had been delivered by Briggs. Robert referred the Briggs people to Scott, who could not be found. Robert was observed going in and out the Starr Sales premises with a bank deposit pouch. Shortly, the merchandise disappeared.

When Scott finally was reached by telephone on November 11, he claimed the merchandise was in a U-Haul van but would not tell where the van was located. None of the goods shipped were recovered.

Briggs paid Northern State, took an assignment of that company's claims, and brought this law action. The amended petition, in several divisions, alleged defendant Starr Sales fraudulently breached a contract for sale of goods with Northern State, that Scott, Robert and Martha were individually liable for the breach as principals of a sham corporation and committed fraud individually and in conspiracy, for which plaintiff sought actual and punitive damages.

Trial was to the court. The court found Robert was a director and officer of Starr Sales at all relevant times and participated in fraudulent activities. It rendered judgment against Starr Sales, Scott and Robert for $17,612.33 and interest, and for $8806.17 in punitive damages. Although the court found Martha was a corporate officer and stockholder, it determined she had no active part in the corporate business and therefore should not be held personally liable to Briggs.

Defendant Robert appeals from the judgments against him. Plaintiff Briggs cross-appeals, asserting Martha should be held liable for actual damages. We affirm on the appeal. We reverse and remand on the cross-appeal.

I. *Did trial court err in holding Robert Voeltz personally liable for compensatory and punitive damages?*

Robert contends the trial evidence neither supported the finding he was a director and shareholder of Starr Sales nor warranted piercing the corporate veil to hold him personally liable for actual and punitive damages.

We consider these contentions from the premise trial court's findings of fact in this law action are binding on appeal if supported by substantial evidence. Rule 14(f)(1), Rules of Appellate Procedure.

A finding of fact is supported by substantial evidence if the finding may reasonably be inferred from the evidence. In evaluating sufficiency of evidence, we view it in its light most favorable to sustaining the court's judgment. We need only consider evidence favorable to the judgment, whether or not it is contradicted. *Grefe v. Ross,* 231 N.W.2d 863, 865 (Iowa 1975).

We first examine Robert's liability as an officer and stockholder of Starr Sales.

A corporate officer is individually liable for fraudulent corporate acts which he or she participated in or committed. *Grefe v. Ross,* supra, 231 N.W.2d at 868. The exemption from personal liability of

corporate directors and officers is subject to the qualification of good faith, and honesty of intent and purpose. Where there is ulterior motive, the immunity is withdrawn. Feuer, Personal Liabilities of Corporate Officers and Directors, pp. 219–220 (1961).

Directors or officers of a corporation may be presumed to have knowledge of the financial affairs of their corporation when making statements concerning its financial condition. It is not necessary that they know such statements to be false and fraudulent, it is their duty to know them to be true, and they are liable in damages to anyone dealing with the corporation, relying on the truth of such false or fraudulent financial reports. *Hubbard v. Weare,* 79 Iowa 678, 687–688, 44 N.W. 915, 918 (1890); see *Boddy v. Henry,* 113 Iowa 462, 466–472, 85 N.W. 771, 772–774 (1901); 19 Am.Jur.2d, Corporations, § 1385, p. 781 (1965).

There was ample evidence to support the finding Robert was an officer, director and owner of the corporation. In addition to the representations he made on the credit application and to Dun & Bradstreet, he is disclosed as the incorporator in the articles of incorporation filed in the office of secretary of state October 25, 1974, and as an incorporator and director in the notice of incorporation published November 18, 1974. Deposition testimony introduced into evidence identified Robert as an officer, director and stockholder.

Robert relied on an alleged resignation as director of the corporation. A written resignation dated October 31, 1974, was offered in evidence. Robert testified this resulted from a quarrel with Scott concerning financing and ordering the merchandise, and he had nothing to do with the corporation from that date.

Other evidence impeaches the validity of this purported resignation. It was never mentioned by Robert in his telephone conversation with Schulze of Northern State on October 31. On the next day he acknowledged ownership of the corporation, as shown by the Dun & Bradstreet report. There were inconsistencies in the testimony of Scott and Robert concerning preparation and delivery of the written resignation. The same firm which allegedly prepared the resignation caused the notice of incorporation to be published 18 days later listing Robert as a director. Robert's name was not removed from the bank signature card until January 31, 1975, when the small account was closed.

The above, together with other evidence and inferences in the record, was sufficient to support trial court's finding Robert neither resigned as an officer and director, nor surrendered any right he had as an owner.

The Starr Sales credit information furnished by Robert was false. Trial court was justified in finding that although credit was not granted, a C.O.D. sale was made and Northern State risked several hundred dollars in freight charges and the inherent hazard of such mishaps as disclosed by the facts of this case. The record is clear Northern State would never have made the shipment to Scott.

Further, trial court had solid evidentiary ground to find that defendants, Scott, Robert and Starr Sales, "knowing that there had been an error made in delivery, refused to pay plaintiff the $17,612.33 pursuant to the terms of the invoice, and intentionally hindered, delayed and attempted to mislead the plaintiff in regard to the whereabouts of the goods."

Under the principles above stated, trial court correctly found Robert liable.

We also hold trial court was justified in piercing Starr Sales' corporate veil to find Robert personally liable.

Central to corporate law is the concept a corporation is an entity separate from its owners. The separate corporate personality ordinarily enables corporate stockholders to limit their personal liability to the extent of their investment. *Krivo Industrial Sup. Co. v. National Distill. & Chem. Corp.,* 483 F.2d 1098, 1102 (5th Cir. 1973).

But the corporate device cannot in all cases insulate the owners from personal

liability. *Id.* The corporate veil may be pierced under exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate business purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice. See *Newberry v. Barth, Inc.,* 252 N.W.2d 711, 714 (Iowa 1977).

■ In the parent-subsidiary context we have stated the corporate entity should be disregarded where doing so would prevent the parent from perpetuating a fraud or injustice, evading just responsibility or defeating public convenience. *Inn Operators, Inc. v. River Hills Motor Inn Co.,* 261 Iowa 72, 84–85, 152 N.W.2d 808, 815–816 (1967); *Wescott & Winks Hatcheries v. F. M. Stamper Co.,* 249 Iowa 30, 35–36, 85 N.W.2d 603, 606–607 (1957).

The eighth circuit court in *Lakota Girl Scout C., Inc. v. Havey Fund-Rais. Man., Inc.,* 519 F.2d 634, 638 (8th Cir. 1975), applied Iowa authority in reviewing the propriety of a federal district court decision to pierce the veil of a corporation. Citing 1 W. M. Fletcher, Cyclopedia of the Law of Private Corporations, § 41.3 (1974), the eighth circuit agreed factors to be considered include whether (1) the corporation is undercapitalized, (2) the corporation lacks separate books, (3) its finances are not kept separate from individual finances, or individual obligations are paid by the corporation, (4) the corporation is used to promote fraud or illegality, (5) corporate formalities are not followed, or (6) the corporation is a mere sham.

Evidence relating to capitalization came through Scott's testimony on deposition that "[t]here wasn't any money paid in. There wasn't any assets." On trial he claimed his capital contribution "was in the form of * * * acquisition fees and expenses of getting it started. That was about $2000." Trial court disbelieved this evidence. Scott conceded when the merchandise was delivered he had obtained no financing to pay for it. He refused to state what happened to the proceeds from sale of the merchandise on the ground it might incriminate him, but volunteered, "I had some creditors and other bills."

■ An abuse of the corporate privilege may justify piercing the corporate veil as to persons who actively participate in the conduct of corporate affairs and have provided inadequate capitalization. See *Anderson v. Abbott,* 321 U.S. 349, 362, 64 S.Ct. 531, 537–538, 88 L.Ed. 793, 802–803 (1943); *Minton v. Cavaney,* 56 Cal.2d 576, 579, 15 Cal. Rptr. 641, 643, 364 P.2d 473, 475 (1961). The applicable rationale is stated in Ballantine, Corporations, § 129, pp. 302–303 (rev. ed. 1946):

"If a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable that shareholders should set up such a flimsy organization to escape personal liability. The attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity and will be ineffectual to exempt the shareholders from corporate debts. It is coming to be recognized as the policy of the law that shareholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for its prospective liabilities. If capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege."

The facts before us demonstrate the logic behind the above rule.

Turning to the second criterion listed by the *Lakota* court, supra, the only evidence Starr Sales had any corporate books was Scott's testimony these records had been destroyed in a November truck accident. The district court disbelieved this evidence.

Corporate funds were not segregated. Merchandise sale proceeds were not deposited in the corporate bank account. Scott claimed the protection of the fifth amendment rather than testify what he did with these proceeds. See *Bauer v. Stern Finance Company,* 169 N.W.2d 850, 854 (Iowa 1969),

cert. den., 396 U.S. 1008, 90 S.Ct. 565, 24 L.Ed.2d 500 (1970). There is a strong inference they were used by Scott for his individual purposes, and that a portion was paid to Robert in his role as Scott's creditor. On cross-examination Robert explained, "I paid a thousand dollars of bills that he got in a jam and had to pay, and when he would reimburse me—when he got some money he would reimburse me, but I still haven't got it all back."

There was little evidence Starr Sales was ever intended to be or operated as a valid corporation. It was a sham, and under the above criteria cannot shield the officers and directors from liability arising out of their conduct. Trial court rightfully imposed judgment for damages against Robert. Because of the malicious intent the evidence disclosed, trial court was justified in rendering judgment for punitive damages. See *Amos v. Prom,* 115 F.Supp. 127 (N.D.Iowa 1953); *Northrup v. Miles Homes, Inc. of Iowa,* 204 N.W.2d 850, 859 (Iowa 1973).

II. *Did trial court err in failing to hold Martha Voeltz personally liable for compensatory damages?*

The information Robert forwarded Dun & Bradstreet designated Martha Voeltz as vice-president and treasurer of Starr Sales.

On deposition Scott identified his mother as a stockholder of the corporation. On deposition Robert testified Martha was secretary of the corporation, but denied this at trial. There is no dispute her signature remained on the corporate bank signature card as "secretary, treasurer, or cashier" until the account was closed January 31, 1975.

Trial court held the evidence disclosed Martha "to be an officer of said corporation and a stockholder." However, the court also found Briggs had failed to show by a preponderance of evidence that she had any active part in the incorporation or business of the corporation. It therefore concluded she should not be held personally liable to Briggs.

Trial court may have been right in so holding on the theory of individual liability of a corporate officer for fraudulent corporate acts in which she or he participated, a theory we explored in division I. See 19 Am.Jur.2d, Corporations, § 1382, pp. 778–779 (1965).

But Martha, as an officer and owner of a close corporation is not individually immune from personal liability for actual damages under the doctrine which permits piercing the corporate veil. As a major corporate officer she could not avoid liability by emulating the three fabled monkeys, hearing, seeing and speaking no evil. Nor could she ignore the reality Starr Sales had evaded the most basic aspects of corporate existence. See 19 Am.Jur.2d, Corporations, § 1276, pp. 683–684, § 1286, pp. 693–694 (1965). For example, she had a responsibility to know Starr Sales was without initial capital and that corporate books were nonexistent. See *Lakota Girl Scout C., Inc. v. Havey Fund-Rais. Man., Inc.,* supra, 519 F.2d at 638; *Minton v. Cavaney,* supra, 56 Cal.2d at 580, 15 Cal.Rptr. at 643, 364 P.2d at 475–476; Ballantine, Corporations, supra, § 129, pp. 302–303.

When the separate entity privilege is denied, as it should be in this situation, it is clear a shareholder or equitable owner who is also a major officer of a close corporation ordinarily cannot escape personal liability. *Id.*

In division I we noted our basic rule that on appeal from a law action tried to the court, its findings are binding upon the appellate court if supported by substantial evidence. Rule 14(f)(1), R.Ap.P. However, this rule does not preclude inquiry into the question whether, conceding the truth of the facts found, a conclusion of law drawn therefrom is correct, nor are we bound by trial court's determination of the law. See *Flexsteel Ind., Inc. v. Morbern Ind. Ltd.,* 239 N.W.2d 593, 598 (Iowa 1976); *In re Estate of Northup,* 230 N.W.2d 918, 921 (Iowa 1975); *Whewell v. Dobson,* 227 N.W.2d 115, 117 (Iowa 1975).

In the case before us we are in accord with district court's factual findings relating to Martha's role in the corporation. We simply hold under those facts and the applicable rules of law relating to denial of the separate entity privilege, supra, she also is liable for the indebtedness owed Briggs.

We affirm on the appeal and reverse on the cross-appeal. We remand to district court for entry of judgment in favor of plaintiff and against Martha Voeltz for $17,612.33, with interest at 5% from November 15, 1974 to December 31, 1974, and thereafter at 7% to date of payment.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.