# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2433

_____

HOK Sport, Inc., case filed as HOK   *
Sport, Inc., now known as Sport Venue   *
Event,   *
  *
  *
       Appellee,   *
  *   Appeal from the United States
    v.   *   District Court for the
  *   Southern District of Iowa.
FC Des Moines, L.C., doing business as   *
Des Moines Menace Soccer Club;   *
The Stadium Foundation; Kyle Krause,   *
  *
       Appellants.   *

_____

Submitted: March 15, 2007
Filed: August 10, 2007

_____

Before RILEY, BOWMAN, and ARNOLD, Circuit Judges.

_____

RILEY, Circuit Judge.

After a ten-day trial, the jury returned a verdict in favor of HOK Sport, Inc. (HOK Sport) and against FC Des Moines, L.C., doing business as Des Moines Menace Soccer Club (The Menace), The Stadium Foundation (TSF), and Kyle Krause

(Krause) (collectively, the defendants) in the amount of $436,800. The district court[1] entered judgment in accordance with the verdict. The defendants appeal. We affirm.

## I.  BACKGROUND
### A.  Factual Background

HOK Sport is a subsidiary of Hellmuth, Obata + Kassabaum, Inc., the largest architectural firm in the United States. HOK Sport has designed stadiums for twenty-four Major League Baseball and thirty National Football League franchises, as well as soccer, minor league baseball, and collegiate stadiums.

Krause is the president and chief executive officer of Kum & Go, L.C. (Kum & Go), a chain of convenience stores located throughout the Midwest. Krause owns approximately 90% of FC Des Moines, which owns The Menace. The Menace is a minor league soccer club located in Urbandale, Iowa, a suburb of Des Moines, Iowa. Krause, as the owner of The Menace, wanted a new soccer stadium built in Urbandale to increase the market value and prestige of The Menace. Upon completion of the stadium, the City of Urbandale would have owned the stadium and received a nominal rent payment. Calcio, a for-profit entity owned by Krause, would have operated the stadium as a for-profit business. Under this arrangement, The Menace, as a tenant of the stadium, would have paid rent to Calcio.

On November 8, 2001, Krause created TSF, a nonprofit corporation. According to TSF's Articles of Incorporation, TSF was to "be operated exclusively for the benefit of . . . the City of Urbandale, Iowa . . . by constructing and maintaining a stadium." TSF raised funds to build the stadium from both public and private sources, including a $2 million donation from Krause that was contingent upon construction of the stadium.

---

[1]The Honorable Thomas J. Shields, United States Magistrate Judge for the Southern District of Iowa, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

Krause was TSF's president, sole officer, and only member of its board of directors. Under Krause's supervision, TSF filed articles of incorporation with the Secretary of State and drafted bylaws. Krause, however, did not always treat TSF and The Menace as separate entities. For example, TSF lacked a bank account from November 8, 2001 until March 2002, and in the interim, TSF's deposits were credited to The Menace's bank account. TSF was incorporated without any capital despite accounting entries showing TSF owed $78,000[2] to The Menace for services rendered before TSF was incorporated. Krause requested employees of The Menace and Kum & Go work as volunteers for TSF. These volunteers provided accounting and other services to TSF. The only person ever to be a full-time employee of TSF was Sharon Krause, Krause's wife. TSF never held a board meeting.

On September 7, 2000, The Menace sent out a Request for Proposals for Architectural Services (RFP). The Menace selected and contracted with HOK Sport as the architect for the stadium. The RFP indicated the stadium's initial seating capacity would be between 5,000 and 7,000 and the estimated cost of construction would be between $13.3 and $15.4 million. The location for the new stadium was N.W. 142nd Street and Aurora Avenue in Urbandale. The RFP set the completion date as the spring of 2002; however, Krause later moved the completion date to the spring of 2003. To accommodate this construction schedule, HOK Sport treated the project as a fast-track project, in which subsequent design phases may be started even though a previous one had not yet been completed.

On November 7 and 21, 2001, HOK Sport mailed letter agreements to TSF regarding the performance of architectural services for the stadium. On December 4, 2001, Krause, on behalf of TSF, signed the letter agreement dated November 21, 2001. The letter agreement provided HOK Sport would provide architectural services

---

[2]The $78,000 included a charge for tax preparations for the year 2000, well before TSF was incorporated.

for the stadium, including planning analysis, programming, conceptual design, and cost estimates. The letter agreement contained a future services clause, which provided:

> It is anticipated that upon conclusion of the Conceptual Design Services the project will be defined with sufficient detail and parameters to proceed with basic design services from Schematic Design through Construction Administration as identified in [the American Institute of Architects (AIA)] B141 Agreements. This letter agreement will act as a letter of intent to the effect that HOK Sport will be retained by the Owner to continue providing design services for this project through completion of construction. The professional services fees payable to HOK Sport and its consultants shall range from 8.0% of a $10,600,000 construction cost to 8.5% of a $8,000,000 construction cost.

Pursuant to the future services clause, in February 2002, HOK Sport mailed a contract based on AIA B141CM[3] to TSF. TSF never signed or agreed to the proffered contract.

HOK Sport started programming and conceptual design work for the stadium in November 2001. Generally, the programming and conceptual design work includes some design work, site planning, and drawings with limited detail. On December 10, 2001, HOK Sport submitted a $30,000 invoice to The Menace for services rendered before December 1, 2001. On January 3, 2002, The Menace paid HOK Sport the $30,000. HOK Sport completed the programming and conceptual design work in late January or early February 2002. On April 5, 2002, HOK Sport submitted a second $30,000 invoice for services rendered through January 30, 2002.

---

[3]HOK submitted a contract based on AIA B141CM, rather than AIA B141, because AIA B141CM is appropriate when the owner hires a construction manager. TSF hired the Weitz Company as the construction manager for the stadium project.

HOK Sport also simultaneously performed schematic design work. By March 29, 2002, HOK Sport had generally completed the preliminary schematic design work, and, on April 9, 2002, HOK Sport billed TSF $142,416 for the work. Shortly thereafter, TSF paid $172,416 to HOK Sport for both the second invoice for the programming and conceptual design work and the schematic design work. Before writing the $172,416 check, TSF had $9,300.26 in its newly opened bank account. To cover the balance of the check, Krause ordered Kum & Go to deposit $190,000 in TSF's bank account.

HOK Sport completed the design development phase on June 26, 2002. Design development includes designing the mechanical, electrical, and structural systems in greater detail. In the pre-construction phase, Weitz Company (Weitz), the construction manager, developed cost estimates and schedules, as well as reviewed plans and specifications. On July 17, 2002, based on HOK Sport's design development plans, Weitz submitted a cost estimate of $19,661,358 for the stadium. The $19,661,358 estimate exceeded the construction budget, which then was between approximately $8 and $14 million. In response, Krause ordered HOK Sport to delay the design and construction work and to begin value engineering, that is, cutting features to reduce the cost of the project. Accordingly, HOK Sport stopped work. The construction documents were approximately 75% complete when HOK Sport stopped work.

On April 29, 2003, the City of Urbandale decided not to move forward with the stadium. As a result, Krause presented the stadium project to other cities in Iowa, including Des Moines, West Des Moines, Waukee, Grimes, Carlisle, Altoona, and Johnston. During presentations to these cities, Krause represented he was acting on behalf of TSF and used materials prepared by HOK Sport. HOK Sport submitted an invoice to The Menace for $710,377.58 for services rendered through July 31, 2002. TSF never paid the invoice because the cost estimate exceeded the project budget.

**B.     Procedural Background**

HOK Sport filed a complaint, bringing four causes of action: (1) breach of contract against TSF and The Menace; (2) unjust enrichment against TSF and The Menace; (3) quantum meruit against TSF and The Menace; and (4) civil fraud against TSF, The Menace, and Krause. HOK Sport also sought to hold Krause personally liable by disregarding TSF's and The Menace's corporate form. TSF brought counterclaims against HOK Sport for (1) breach of contract and (2) negligent misrepresentation.

The Menace filed a motion for summary judgment, arguing The Menace was not a proper party to the dispute. The district court denied The Menace's motion. The dispute proceeded to trial. At the conclusion of the evidence, HOK Sport and the defendants filed motions for judgment as a matter of law; however, The Menace never argued it was not a proper party to the dispute. The district court denied the motions. The jury returned a verdict, finding (1) HOK Sport had not proven its breach of contract claim against TSF and The Menace; (2) HOK Sport had proven its breach of implied contract and unjust enrichment claims against TSF and The Menace; (3) HOK Sport had not proven its fraudulent misrepresentation claim against TSF, The Menace, and Krause; (4) HOK Sport had proven Krause should be held personally liable for the damages award against TSF, but HOK Sport had not proven Krause should be held personally liable for the damages award against The Menace. The jury also found TSF had not proven either its breach of contract counterclaim or its negligent misrepresentation counterclaim. The jury awarded HOK Sport $436,800 in damages. The district court entered judgment in accordance with the verdict.

This appeal followed. The defendants argue the jury instructions misstated the applicable law by instructing (1) Iowa Code § 504A.101 (2003) did not preempt common-law rights, including the alter ego doctrine and the remedy of piercing the corporate veil; (2) the veil of a nonprofit corporation could be pierced because it was undercapitalized; and (3) the veil of a nonprofit corporation could be pierced because

-6-

it failed to follow corporate formalities. The defendants also argue insufficient evidence supports disregarding TSF's corporate form and a new trial is warranted. The Menace further contends it is not a proper party. The defendants appealed neither the amount of damages nor the district court's judgment on the defendants' counterclaims.

## II.   DISCUSSION

We review de novo the denial of a motion for judgment as a matter of law, applying the same standard as the district court. Canny v. Dr Pepper/Seven-Up Bottling Group, Inc., 439 F.3d 894, 899 (8th Cir. 2006). "If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law." Fed. R. Civ. P. 50(a)(1) (2005). All reasonable inferences and facts are viewed in the light most favorable to the nonmoving party. Christensen v. Titan Distrib., Inc., 481 F.3d 1085, 1092 (8th Cir. 2007). In reviewing the denial of a motion for judgment as a matter of law, we neither assess credibility nor weigh the evidence. Synergetics, Inc. v. Hurst, 477 F.3d 949, 956 (8th Cir. 2007). "[W]here conflicting inferences reasonably can be drawn from evidence, it is the function of the jury to determine what inference shall be drawn." Canny, 439 F.3d at 900 (quotation omitted). "We are reluctant to set aside a jury's verdict and will not do so lightly." Id. (internal quotation marks omitted). We can affirm the denial of a motion for judgment as a matter of law on any basis the record supports. Christensen, 481 F.3d at 1094.

## A.     Jury Instructions on Disregarding TSF's Corporate Form

We review de novo matters of law, including jury instructions interpreting state statutes.  See Minn. Supply Co. v. Raymond Corp., 472 F.3d 524, 537 (8th Cir. 2006); Archer Daniels Midland Co. v. Aon Risk Servs., Inc. of Minn., 356 F.3d 850, 855 (8th Cir. 2004).  Because the federal courts have diversity jurisdiction over the instant dispute pursuant to 28 U.S.C. § 1332, we apply the law of the State of Iowa.  See Doe v. Baxter Healthcare Corp., 380 F.3d 399, 407 (8th Cir. 2004).  In applying Iowa law, we must accept the decisions of the Iowa Supreme Court as the controlling precedent. See St. Paul Fire & Marine Ins. Co. v. Schrum, 149 F.3d 878, 880 (8th Cir. 1998). The Iowa Supreme Court, however, has not expressly considered the issues presented in this dispute.  To predict how the Iowa Supreme Court would resolve the issues, Lindsay Mfg. Co. v. Hartford Accident & Indemn. Co., 118 F.3d 1263, 1267-68 (8th Cir. 1997), we will consider "relevant state precedent, analogous decisions, considered dicta, and any other reliable data."  Riordan v. Church of Jesus Christ of Latter-Day Saints, 416 F.3d 825, 829 n.2 (8th Cir. 2005) (quotation and ellipsis omitted).

Under Iowa law, an entity's corporate form can be disregarded either by applying the alter ego doctrine or by piercing the corporate veil. See Team Cent., Inc. v. Teamco, Inc., 271 N.W.2d 914, 923 (Iowa 1978) (en banc).  Typically, a corporate entity and its owners are separate and distinct.  This arrangement encourages investment by limiting the owners' exposure to the amount invested.  See Briggs Transp. Co. v. Starr Sales Co., 262 N.W.2d 805, 809 (Iowa 1978). Nonetheless, "[w]here equity requires us to examine the purposes of a corporation, we are not bound by forms, fiction, or technical rules," we want the truth.  Benson v. Richardson, 537 N.W.2d 748, 762 (Iowa 1995).  Disregarding the entity's corporate form under either the alter ego doctrine or the remedy of piercing the corporate veil is an extraordinary measure that should be reserved for exceptional circumstances, see In re Ballstaedt, 606 N.W.2d 345, 349 (Iowa 2000); Grand Lodge of Iowa of the Indep. Order of Odd Fellows v. Osceola Lodge No. 18, 178 N.W.2d 362, 368 (Iowa 1970),

and the party seeking to do so bears the burden of proof, <u>see</u> <u>C. Mac. Chambers Co. v. Iowa Tae Kwon Do Acad., Inc.</u>, 412 N.W.2d 593, 598 (Iowa 1987) (en banc).

To further the public convenience, cure wrongs, protect against fraud, and advance the ends of justice, the alter ego doctrine disregards an entity's corporate form if the entity is "merely an instrumentality or device set up to ensure the avoidance of the legal obligations." <u>Benson</u>, 537 N.W.2d at 761 (citing <u>Kline v. Kline</u>, 305 N.W.2d 297, 299 (Mich. Ct. App. 1981) (per curiam)). A corporate entity is the alter ego of a person if (1) the person influences and governs the entity; (2) a unity of interest and ownership exists such that the corporate entity and the person cannot be separated; and (3) giving legal effect to the fictional separation between the corporate entity and the person would "sanction a fraud or promote injustice."[4] <u>Frank McCleary Cattle Co. v. C.A. Sewell</u>, 317 P.2d 957, 959 (Nev. 1957), <u>cited with approval in</u> <u>Odd Fellows</u>, 178 N.W.2d at 368; <u>accord</u> <u>Benson</u>, 537 N.W.2d at 761. The alter ego doctrine applies to nonprofit corporations to the same extent it applies to for-profit corporations. <u>E.g.</u>, <u>Odd Fellows</u>, 178 N.W.2d at 364, 368.

Piercing the corporate veil is a common-law equitable remedy whereby an entity's corporate form is disregarded to prevent an injustice. <u>See</u> <u>id.</u> at 368; <u>see also</u> <u>United States v. Bestfoods</u>, 524 U.S. 51, 62 (1998). Under Iowa law, disregarding an entity's corporate form by piercing the corporate veil is appropriate if "'the

---

[4]In addition to applying to persons using a corporate entity as a mere instrumentality, the alter ego doctrine also applies to a corporate entity using another corporate entity as a mere instrumentality. <u>See</u> <u>Schnoor v. Deitchler</u>, 482 N.W.2d 913, 915-16 (Iowa 1992) (en banc) ("Courts have disregarded the separate corporate personalities of parent and subsidiary corporations in certain circumstances to prevent the parent corporation from perpetuating a fraud, evading just responsibility, or defeating public convenience.");William Meade Fletcher, <u>Fletcher Cyclopedia of the Law of Corporations</u> § 41.10 (2006) ("Under the alter ego doctrine, when a corporation is the mere instrumentality or business conduit of another corporation or person, the corporate form may be disregarded.").

corporation is a mere shell, serving no legitimate business purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice.'" In re Ballstaedt, 606 N.W.2d at 349 (quoting C. Mac. Chambers, 412 N.W.2d at 597 (quoting Briggs Transp., 262 N.W.2d at 810)). "[M]ere identity of . . . ownership and corporate management is not alone sufficient to permit a piercing of the corporate veil." Team Cent., 271 N.W.2d at 923.

"An abuse of the corporate privilege may justify piercing the corporate veil as to persons who actively participate in the conduct of corporate affairs and have provided inadequate capitalization." Briggs Transp., 262 N.W.2d at 810. The corporate form can be disregarded if "(1) the corporation is undercapitalized, (2) without separate books, (3) its finances are not kept separate from individual finances, individual obligations are paid by the corporation, (4) the corporation is used to promote fraud or illegality, (5) corporate formalities are not followed[,] or (6) the corporation is merely a sham." Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Mgmt., Inc., 519 F.2d 634, 638 (8th Cir. 1975), cited with approval by C. Mac Chambers, 412 N.W.2d at 598. A party seeking to pierce the corporate veil need not prove all six factors, but it must prove at least one of the factors. See Fazio v. Brotman, 371 N.W.2d 842, 846 (Iowa Ct. App. 1985). For example, fraud is a sufficient, but not necessary, condition for piercing the corporate veil. See Adam v. Mount Pleasant Bank & Trust Co., 355 N.W.2d 868, 872 (Iowa 1984) ("Fraud is not a prerequisite for piercing the corporate veil."); State ex rel. Miller v. Internal Energy Mgmt. Corp., 324 N.W.2d 707, 715 (Iowa 1982) ("[F]raud constitutes a sufficient basis for piercing the corporate veil."); see also Team Cent., 271 N.W.2d at 923. For the same equitable reasons, courts apply the remedy of piercing the corporate veil to both for-profit and nonprofit corporations. See William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 41.75 (2006).

-10-

### 1. Iowa Code § 504A.101

Krause argues the alter ego doctrine and the remedy of piercing the corporate veil are inapplicable to nonprofit corporations because Iowa Code § 504A.101 (2003)[5] is the exclusive means to impose personal liability on the directors of nonprofit corporations. Unless the language of a statute directly negates the common law, the statute must be interpreted in conformity with the common law. Rieff v. Evans, 630 N.W.2d 278, 285 (Iowa 2001) (en banc). If, however, the statute has preempted common-law rights, the common law must recede. Id. at 285-86. "[S]tatutes will not be construed as taking away common law rights existing at the time of enactment unless that result is 'imperatively' required by the language of the statute." Collins v. King, 545 N.W.2d 310, 312 (Iowa 1996); accord Bestfoods, 524 U.S. at 63 (stating "'to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law'" (quoting United States v. Texas, 507 U.S. 529, 534 (1993))).

---

[5]Section 504A.101 provides:

> Except as otherwise provided in this chapter, a director, officer, employee, or member of the corporation is not liable on the corporation's debts nor obligations and a director, officer, member, or other volunteer is not personally liable in that capacity, for a claim based upon an act or omission of the person performed in the discharge of the person's duties, except for a breach of the duty of loyalty to the corporation, for acts or omissions not in good faith or which involve intentional misconduct or knowing violation of the law, or for a transaction from which the person derives an improper personal benefit.

Iowa Code § 504A.101 (2003), repealed by Revised Iowa Nonprofit Corporation Act, (80 G.A.) ch. 1049, § 190 (effective July 1, 2005). Effective July 1, 2005, the Revised Iowa Nonprofit Corporation Act, Iowa Code chapter 504, replaced the Iowa Nonprofit Corporation Act, Iowa Code chapter 504A. See Iowa Code § 504.1701(1). Because HOK Sport filed the instant complaint on August 19, 2003, before the repeal of the Iowa Nonprofit Corporation Act, Iowa Code § 504A.101 (2003) is the applicable law, not Iowa Code §§ 504.613, 504.901. See Iowa Code § 504.1703(1)(a), (b).

Section 504A.101 had three parts.  First, it extended the common-law rule that stockholders generally are not liable for a corporation's debts, see Hampson v. Weare, 4 Iowa 13, 15 (Iowa 1857), to the directors, officers, employees, and members of nonprofit corporations.  Second, it exculpated the directors, officers, members, and other volunteers of nonprofit corporations of personal liability, based solely on their status with the nonprofit corporation, for torts committed by the nonprofit corporation. Cf. Estate of Countryman v. Farmers Coop. Ass'n, 679 N.W.2d 598, 603-05 (Iowa 2004) (en banc) (concluding Iowa Code § 490A.603(1), an analogous statute governing the personal liability of members and managers of limited liability companies, exculpated members and managers "for company torts 'solely by reason of being a member or manager' of an LLC" (quoting Iowa Code § 490A.603(1))).[6] Third, it held the directors, officers, employees, members, and other volunteers of nonprofit corporations personally liable to the same extent the directors of corporations typically are held personally liable.  See Iowa Code § 490.832 (1999); id. § 496A.49(13) (1989).

The language of section 504A.101 does not indicate the Iowa legislature intended to preempt common-law rights.  Cf. Cookies Food Prods., Inc. v. Lakes Warehouse Distrib., 430 N.W.2d 447, 452-53 (Iowa 1988) (concluding a director owed the corporation the additional duties of good faith, honesty, and fairness, although Iowa Code § 496A.34 (1989) only provided self-dealing transactions involving the corporation and director were not void or voidable assuming either complete disclosure and ratification or a fair and reasonable transaction).  The preface

_____

[6]After our oral argument in this case, the Iowa Court of Appeals decided Indian Hills Cmty. Coll. v. Indian Hills Booster Club, 734 N.W.2d 486, No. 06-0392, 2007 WL 911890 (Iowa Ct. App. Mar. 28, 2007) (unpublished table decision), appeal denied, No. 06-0392 (July 17, 2007).  The Iowa Court of Appeals held section 504A.101 imparted immunity to the directors, officers, and volunteers of nonprofit corporations.  Id. at *3.  We refuse to follow the Indian Hills Community College decision because it is contrary to the Iowa Supreme Court's analysis in Estate of Countryman, 679 N.W.2d at 603-04.

to section 504A.101 is insufficiently precise to negate common-law rights. The defendants' interpretation of section 504A.101 is not imperatively required by the statutory language.[7] Forecasting the Iowa Supreme Court's opinion, we hold section 504A.101 preempted neither the alter ego doctrine nor the remedy of piercing the corporate veil.

## 2. Undercapitalization

The defendants argue the district court erred by instructing the jury that TSF's corporate form could be disregarded if TSF were undercapitalized. The defendants assert nonprofit corporations cannot be adequately capitalized because the Iowa Nonprofit Corporation Act prohibited the investment of equity capital in nonprofit corporations. See generally Iowa Code § 504A.26 (2003) ("A [nonprofit] corporation shall not have or issue shares of stock."). In support, the defendants cited Macaluso v. Jenkins, 420 N.E.2d 251, 257 (Ill. App. Ct. 1981), for the proposition "[p]laintiffs, who consented to contract with [a nonprofit corporation], knowingly assumed the risk that the [nonprofit corporation] was thinly capitalized." Id. In Macaluso, the Appellate Court of Illinois, Second Division, affirmed the jury verdict and trial court's decision to pierce the veil of a nonprofit corporation as to the person who "exercised ownership control over," "made most or all of the decisions," "was the sole representative for," and "intended to profit from" the nonprofit corporation. Id. at 255. The appellate court also affirmed the trial court's decision to dismiss the case against a part-time clerical volunteer of the nonprofit corporation. Id. at 257. In doing

---

[7]The rule that statutes in derogation of the common law will not be strictly construed, see Iowa Code § 4.2, is not applicable because the purview of section 504A.101 can be interpreted in such a way as to avoid being in derogation of the common law. Cf. Fabricius v. Montgomery Elevator Co., 121 N.W.2d 361, 364-65 (Iowa 1963) (interpreting the exclusive remedy provision of the Iowa's Workers' Compensation statute not to preclude common-law causes of action against a workers' compensation insurer), superseded by statute on other grounds, Iowa Code § 88A.14 (1971) (since repealed), as recognized in Bowen v. Kaplan, 237 N.W.2d 799, 801 (Iowa 1976).

so, the appellate court noted, in dicta, nonprofit corporations had no duty to be capitalized under Illinois law and the plaintiffs had assumed the risk of nonpayment by dealing with a thinly capitalized nonprofit corporation. Id. We disagree with the dicta in Macaluso.

In the context of a for-profit corporation, the Iowa Supreme Court stated:

> If a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable that shareholders should set up such a flimsy organization to escape personal liability. The attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity and will be ineffectual to exempt the shareholders from corporate debts. It is coming to be recognized as the policy of the law that shareholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for its prospective liabilities. If capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege.

Briggs Transp., 262 N.W.2d at 810 (quoting Henry W. Ballantine, Ballantine on Corporations, § 129 (rev. ed. 1946)).

The reasoning of the Iowa Supreme Court in Briggs Transportation can logically be extended to nonprofit corporations. A corporation may be undercapitalized due to either an insufficient contribution of equity capital or an insufficient amount of capital available to satisfy the corporation's liabilities. See C. Mac Chambers, 412 N.W.2d at 598; see also Fletcher Cyclopedia of the Law of Corporations § 41.33 ("'Inadequate capitalization' generally means capitalization very small in relation to the nature of the business of the corporation and the risks attendant to such businesses."). Although a nonprofit corporation cannot be financed with equity capital, nonprofit corporations typically receive donations and have other sources of funding, such as earned income. See Heather Gottry, Profit or Perish: Non-

Profit Social Service Organizations & Social Entrepreneurship, 6 Geo. J. on Poverty L. & Pol'y 249, 261 (1999). Donations, a form of capital, are to a nonprofit corporation what equity capital is to a for-profit corporation.

A nonprofit corporation's veil may be pierced only if it is undercapitalized in the context of the business that it conducts. Many nonprofit corporations begin operating with very little capital, yet are not necessarily undercapitalized, if the nonprofit corporation assumes only small liabilities and the nature of its business is not particularly risky. Cf. United States v. McGough, 510 F.2d 598, 603 (5th Cir. 1975) (noting nonprofit corporations are "often thinly capitalized"). Alternatively, if a nonprofit corporation engages in commercial transactions and operates as a sophisticated business entity in an area of commerce typically frequented by for-profit businesses, the nonprofit corporation may need to be capitalized to approximately the same extent that a for-profit corporation should be capitalized. See Medlock v. Medlock, 642 N.W.2d 113, 127-28 (Neb. 2002) (holding a nonprofit corporation is subject to the equitable remedy of piercing the corporate veil and explaining "many of the legal changes now applicable to nonprofits reflect logical extensions of settled law to the altered reality of nonprofits. Such extensions are based on a fundamental jurisprudential tenet: Similar factual situations dictate similar legal treatment." (quoting Evelyn Alicia Lewis, When Entrepreneurs of Commercial Nonprofits Divorce: Is it Anybody's Business? A Perspective on Individual Property Rights in Nonprofits, 73 N.C. L. Rev. 1761, 1773 (1995))). We hold, anticipating the result under Iowa law, the veil of a nonprofit corporation may be pierced on grounds the nonprofit corporation was undercapitalized if the nonprofit corporation has operated in a fashion similar to a for-profit business without being sufficiently capitalized. To hold otherwise would be to focus myopically on the entities involved in the transaction rather than the actual substance of the transaction, see Benson, 537 N.W.2d at 762, and would encourage the unscrupulous to take advantage of others by shifting liabilities and risks to nonprofit corporations.

### 3.    Failure to Follow Corporate Formalities

The defendants argue the district court erred by instructing the jury that TSF's corporate form could be disregarded if TSF failed to follow corporate formalities.[8] The Iowa Limited Liability Company Act of 1992, Iowa Code §§ 490A.100–490A.1601, limits the extent of the personal liability of members of limited liability companies to the personal liability of shareholders of corporations, "except that the failure to hold meetings . . . or the failure to observe formalities pertaining to the calling or conduct of meetings shall not be considered a factor tending to establish that the members have personal liability for any debt, obligation, or liability of the limited liability company." Iowa Code § 490A.603(2). Compared to the factors that support piercing the veil of a corporation, section 490A.603(2) eliminated the failure to hold meetings as a factor that could support piercing the veil of a limited liability company. See Estate of Countryman, 679 N.W.2d at 602-03. The elimination of the failure to hold meetings factor for limited liability companies is rational because the managers or members of limited liability companies may exercise corporate power without making decisions by voting at formal meetings. See Iowa Code § 490A.702(1), .705(1); see also Steven C. Bahls, Application of Corporate Common Law Doctrines to Limited Liability Companies, 55 Mont. L. Rev.

---

[8]The defendants proposed a jury instruction stating: "[t]he mere lack of corporate formalities alone is not enough as a matter of law to impose the remedy of piercing the corporate veil." Because The Menace is a limited liability company, the district court erred by not providing any jury instruction regarding Iowa Code § 490A.603(2). The district court, however, did not err in refusing to provide the defendants' proposed instruction because (in addition to being untimely) it provided exculpation beyond the purview of section 490A.603(2). Compare Iowa Code § 490A.603(2), supra, with Uniform Ltd. Liab. Co. Act § 303(b) (1996) ("The failure of a limited liability company to observe the usual company formalities or requirements relating to the exercise of its company powers or management of its business is not a ground for imposing personal liability on the members or managers for liabilities of the company."). Regardless, any error was harmless because Krause was not found personally liable for the damages award against The Menace. See Fed. R. Civ. P. 61.

43, 63 n.116 (1994); cf. Iowa Code § 490A.701(2), (3) (requiring a majority vote of the limited liability company members only to dissolve and wind up, to sell or pledge all or substantially all of the assets, or to merge, and, unless agreed otherwise, a unanimous vote to amend the articles of organization or operating agreement). In contrast, a corporation's board of directors exercise corporate power by voting on decisions at formal meetings. See id. § 490.801(2), 490.820-.824. Because, in contrast to a corporation, a limited liability company can be managed without holding formal meetings, the failure to hold meetings is not an extraordinary occurrence that supports disregarding its corporate form.

This distinction is important, because the question here is whether nonprofit corporations should be treated as limited liability companies or as corporations for purposes of piercing the corporate veil based on a failure to hold meetings. We hold, again anticipating Iowa law, the corporate form of nonprofit corporations can be disregarded based on a failure to hold meetings for two reasons. First, the Iowa legislature understood how to modify the common-law factors that support piercing the corporate veil, as the Iowa legislature did in the Iowa Limited Liability Company Act modifying these common-law factors for limited liability companies. See Iowa Code § 490A.603(2). Because the Iowa legislature modified the common-law factors that support piercing the veil of a limited liability company (yet the legislature did not do so for nonprofit corporations) to give effect to the legislature's decision not to modify the common-law factors that support piercing the veil of a nonprofit corporation, we conclude the factors that support piercing the veil of a corporation also support piercing the veil of a nonprofit corporation. See generally 2B Norman J. Singer, Statutes and Statutory Construction § 53.03 (6th ed. 2000) ("By referring to other similar legislation, a court is able to learn the purpose and course of legislation in general, and by transposing the clear intent expressed in one or several statutes to a similar statute of doubtful meaning, the court not only is able to give effect to the probable intent of the legislature, but also to establish a more uniform and harmonious system of law."). Second, this holding is consistent with the notion that

nonprofit corporations operate in a manner similar to corporations. For example, the nonprofit corporation's board of directors exercises corporate power by making decisions at formal meetings. See Iowa Code § 504A.17, .20, .22 (2003). Treating a nonprofit corporation as a corporation for purposes of piercing the veil based on the failure to hold meetings is consistent with the Code of Iowa. See generally Fleur de Lis Motor Inns, Inc. v. Bair, 301 N.W.2d 685, 689 (Iowa 1981) ("The objective of statutory construction is to give effect to the intention of the General Assembly.").

The district court did not err in instructing the jury on these issues.

### B. Sufficiency of the Evidence

Krause argues insufficient evidence supports holding him personally responsible for TSF's debts under both the alter ego doctrine and the remedy of piercing the corporate veil. Viewing all reasonable inferences and facts in favor of HOK Sport, we conclude legally sufficient evidentiary bases exist to hold Krause personally liable under both theories.

### 1. Alter Ego Doctrine

Krause, as the president, only officer, and only member of the board of directors of TSF, had complete control over TSF's operations. Krause, and no one else, represented TSF. Krause used TSF to further his own personal goal: the construction of a new soccer stadium to increase the value and prestige of The Menace. Krause developed an elaborate plan to build a stadium to maximize his profits while shedding any liability or risk: (1) TSF, a nonprofit corporation without any capital, was to raise funds to pay for the stadium and assume all the risk associated with its construction; (2) The Menace, a limited liability company controlled by Krause, would be the primary beneficiary of the stadium, yet, would contribute nothing towards the cost of construction; (3) Calcio, a for-profit business owned by Krause, would earn a profit by operating the stadium, yet like The Menace, would contribute nothing towards the cost of construction; and (4) the City of Urbandale would assume the costs associated

with owning and maintaining the stadium, yet would receive only a nominal rent payment from Calcio. When the proprietor of a for-profit business establishes a nonprofit corporation to assume a liability or risk that otherwise, in the ordinary course of business, would have been assumed by a for-profit business, and when the nonprofit corporation accrued liabilities without any means to satisfy the liabilities, a reasonable jury may easily decide that allowing the for-profit business (or its owner) to escape the liability would be sanctioning a fraud and promoting an injustice. See Cent. Nat'l Bank & Trust Co. of Des Moines v. Wagener, 183 N.W.2d 678, 681 (Iowa 1971) (affirming the trial court's decision to disregard the corporate form when "[t]he evidence clearly shows the use of the corporation as a tool to juggle assets and liabilities"). A reasonable jury had a sufficient evidentiary basis on which to conclude Krause incorporated TSF as a nonprofit corporation to avoid risk and the payment of legal obligations. Sufficient evidence supports imposing liability on Krause under the alter ego doctrine.

### 2.     Piercing TSF's Corporate Veil

Likewise, several factors support piercing TSF's corporate veil to impose personal liability on Krause. First, TSF was incorporated without any capital or donations, despite Krause, on behalf of The Menace, having charged TSF $78,000 for services rendered before its incorporation. Although Krause intended to make a $2 million donation to TSF in the future, Krause's donation, like all the other donations and funds available to TSF, was contingent on the construction of the stadium. TSF's debt to HOK Sport, however, was not contingent on the construction of a stadium. By being in the business of constructing a stadium, TSF needed to be sufficiently capitalized so TSF could pay its debts even if the stadium project failed. TSF never had sufficient capital to pay for the stadium's design in the event the stadium was not built.

Second, TSF's finances were not always kept separate from the finances of The Menace and of Kum & Go. Krause controlled each of these three entities and shifted

money among the entities at will. Before TSF had its own bank account, TSF's receipts were deposited in The Menace's bank account. Cf. Briggs Transp., 262 N.W.2d at 810 (affirming the trial court's decision to pierce the corporate veil because "sale proceeds were not deposited in the corporate bank account"). Occasionally, The Menace would loan money to TSF, and, at other times, TSF would loan money to The Menace. Kum & Go loaned $190,000 to TSF to cover a payment to HOK Sport. Although The Menace and Kum & Go are corporate entities that are nominally separate from Krause, this factor still weighs in favor of piercing TSF's veil because a reasonable jury could conclude Krause treated each entity as his own slush fund. TSF's finances were not kept separate from The Menace's and Kum & Go's finances, and by extension, Krause's finances.

Third, TSF failed to observe the typical corporate formalities. TSF has never held a meeting of the board of directors. TSF and The Menace loaned money back and forth without any legal documentation. Krause requested employees of The Menace and Kum & Go work as volunteers for TSF. Cf. Adam, 355 N.W.2d at 872 (noting, in dicta, the Court of Appeals pierced the veil of a corporation, in part, because (1) the "officers ignored their obligations under the corporate articles and bylaws," (2) "there were no board of director meetings" after a certain date, and (3) the officers personally controlled the business and misused corporate funds). Sufficient evidence supports imposing personal liability on Krause by piercing TSF's veil.

The defendants' argument for a new trial similarly is not warranted. See supra; see also Matrix Group Ltd., Inc. v. Rawlings Sporting Goods, Co., 477 F.3d 583, 593 (8th Cir. 2007) ("The denial of a new trial motion based on the argument that the jury verdict was against the weight of the evidence is virtually unassailable on appeal." (internal quotation marks omitted)).

## C. The Menace as a Proper Party

The Menace concedes it failed to renew the argument it was not a proper party to the dispute in its motion for judgment as a matter of law and instead argues we can consider this issue on appeal because the issue is purely a legal one. "'Failure to renew a summary judgment argument—when denial was based on factual disputes—in a motion for judgment as a matter of law under Fed. R. Civ. P. 50(a)(1) at the close of all the evidence is considered a waiver of the issue on appeal.'" White Consol. Indus., Inc. v. McGill Mfg. Co., 165 F.3d 1185, 1189 (8th Cir. 1999) (quoting Wolfgang v. Mid-America Motorsports, Inc., 111 F.3d 1515, 1521 (10th Cir. 1997)). "However, 'when the material facts are not in dispute and the denial of summary judgment is based on the interpretation of a purely legal question, such a decision is appealable after final judgment.'" Id. at 1190 (quoting Wolfgang, 111 F.3d at 1521). Here, the district court denied The Menace's motion for summary judgment based on the existence of genuine issues of material fact, including (1) the existence of any express or implied contract between HOK Sport and The Menace; (2) any financial benefit The Menace reaped from HOK Sport's partial performance of the contract; and (3) Krause's capacity and involvement with the entities. Therefore, because The Menace's argument is not purely a legal question, The Menace waived this argument by failing to renew its summary judgment argument in its motion for judgment as a matter of law.

## III. CONCLUSION

We affirm the judgment of the district court.

_____