## IN THE COURT OF APPEALS OF IOWA

No. 15-0347
Filed December 9, 2015

**KEITH SMITH COMPANY, INC.,**
     Plaintiff-Appellee/Cross-Appellant,

**vs.**

**DUANE BUSHMAN and SHIRLEY BUSHMAN,**
     Defendants-Appellants,

**and**

**FARMER GROWN POULTRY, LLC;**
**DUANE BUSHMAN; SHIRLEY BUSHMAN;**
**BUSHMAN ORGANIC GRAINS, INC.;**
**BUSHMAN ORGANIC FARMS f/k/a**
**Bushman Family Farms;  BUSHMAN**
**ORGANIC POULTRY; and**
**ORGANIC FEED AND GRAINS, LLC;**
     Defendants/Cross-Appellees.

_____

Appeal from the Iowa District Court for Winneshiek County, Margaret L. Lingreen, Judge.

Duane and Shirley Bushman appeal from the district court's ruling to pierce the corporate veil in this breach-of-contract action.  Keith Smith Company, Inc., cross-appeals from the denial of its alter-ego theory of recovery against the remaining defendants.  **AFFIRMED ON BOTH APPEALS.**

John S. Anderson and Stephen J. Belay of Anderson, Wilmarth, Van Der Maaten, Belay, Fretheim, Gipp & Zahasky, Decorah, for appellants.

Mark D. Walz of Davis, Brown, Koehn, Shors & Roberts, West Des Moines, for appellee and cross-appellees.

Heard by Danilson, C.J., and Mullins and McDonald, JJ.

**DANILSON, Chief Judge.**

Duane and Shirley Bushman appeal from the district court's ruling to pierce the corporate veil in this breach-of-contract action. Keith Smith Company, Inc., cross-appeals from the denial of its alter-ego theory of recovery against the remaining defendants. Viewing the evidence in the light most favorable to upholding the judgments, the trial court's fact findings are supported by substantial evidence. Concerning the appeal, the court did not rely solely on the inadequacy of the capitalization of Farmer Grown Poultry, LLC (FGP); rather, its findings support a determination that adherence to the corporate structure would promote an injustice to the creditor, Keith Smith, and we therefore affirm. As to the cross-appeal, we do not disturb the trial court's conclusion that Keith Smith failed to prove the other Bushman-related entities named as defendants were alter egos of FGP, and we affirm on the cross-appeal.

**I. Background Facts and Proceedings.**

Duane Bushman and Shirley Bushman are husband and wife. FGP is a limited liability company. Duane and Shirley Bushman are each fifty-percent owners of FGP. FGP was created to purchase eggs for hatching, coordinate delivery of hatched chicks to contracted growers to feed the birds (Ag Point, LLC being the principal grower), and then coordinate the delivery of the grown birds to Custom Poultry Processing, LLC (CPP). Once CPP was operational, FGP expected to have sales of about $24 million per year, with an average profit margin per chicken of $.06.[1]

---

[1] No formal projections were made. Duane Bushman testified "we've been in business long enough that you know the business."

*Custom Poultry Processing, LLC (CPP).* CPP is also a limited liability corporation. It was formed about August 28, 2009, to purchase, renovate, and operate a Charles City facility as a custom processor of poultry. The owners of CPP include Duane and Shirley Bushman; Greg DeWeese, Stacy Bushman, and Chad Bushman, as well as their spouses; and Ag Point, LLC. Only Ag Point, LLC, which is a two-percent holder of CPP, is not related to the Bushmans. CPP was expected to be operational in September 2010.

The following businesses will be referred to as "Bushman-related entities":

*Bushman Organic Poultry*—Bushman Organic Poultry is a sole proprietorship of Duane Bushman and is involved in organic farming operations, including crop farming, egg production, and poultry production.[2]

*Bushman Organic Grains, Inc.*—Duane and Shirley Bushman, as well as their children Todd Bushman, Chad Bushman, Stacy Bushman, Shanna Schweinefus, and Kimberly DeWeese, are the owners of Bushman Organic Grains, Inc. This company was formed about May 27, 2008, to handle imported organic grains. Records for Bushman Organic Grains were kept by son-in-law Greg DeWeese. The operations of Bushman Organic Grains were moved to Bushman Organic Farms in January 2011.

*Bushman Organic Farms, Inc.*—Duane and Shirley Bushman are the owners of Bushman Organic Farms, Inc. This business is engaged in marketing

---

[2] Bushman Organic Poultry leases its poultry barns to S & C Organic Farms, LLC—owned by Duane's children, Stacy Bushman and Chad Bushman. Six of twelve of the barns owned by Bushman Organic Poultry had been purchased in 2010 "to get ready to expand into." S & C Organic Milling, LLC (also owned by Stacy and Chad) produces chicken feed. Accountant Dan Volz first testified S & C Milling was a supplier of feed for FGP, but later said that was not so because FGP chickens were antibiotic-free but not organic, and to have fed them organic feed would not have been cost effective.

organic grains. The business was formed to purchase and sell organic grains and convert organic soybeans into soybean meal and soybean oil. This entity was formerly known as Bushman Family Farms. Dan Volz became the accountant for Bushman Family Farms (and later for Bushman Organic Farms) in September 2010. Bushman Organic Farms continues to do business in Oregon.

*Organic Feed & Grains, LLC*—Organic Feed & Grains, LLC, is a limited liability company owned by Duane and Shirley Bushman. The non-west coast business operations of Bushman Organic Farms have been moved to Organic Feed & Grains. Its creation on January 3, 2012, allowed for financing from a third party, Lester Feed & Grain.[3] Volz provides accounting services to Organic Feed & Grains via a management fee paid to Bushman Organic Farms on a monthly basis. The two entities maintain separate books.

*Alleged Breach of Contract.* Keith Smith Company, Inc. (Keith Smith), an Arkansas corporation, brought this breach-of-contract action against FGP, asserting FGP owed $235,704.35 for unpaid invoices under a Hatching Egg Purchase Agreement. Keith Smith alleged "FGP is a shell corporation and merely the alter ego of Defendants Duane Bushman, Shirley Bushman, Bushman Organic Grains, Bushman Organic Farms, Inc. f/k/a Bushman Family Farms, Bushman Organic Poultry, and Organic Feed and Grains, LLC." It asked that the Bushmans and the Bushman-related entities be held jointly and severally liable for the debt to FGP.

---

[3] Lester Feed & Grain owns Ag Point, LLC. Duane Bushman testified that after CPP "disaster," the financial lender for Bushman Organic Farms refused to provide further credit. Lester Feed and Grain was willing to provide financing for Bushman but required a new entity be formed.

The case was tried to the court sitting without a jury. The evidence showed that in early 2010, Stacy Bushman made contact with Eddy Slick, a Keith Smith contract sales manager to supply eggs for hatching to FGP. Keith Smith sought credit information for FGP. On May 14, 2010, Beth Jones, the bookkeeper employed by Bushman Organic Farms, provided Bud West an "explanation of financial statements" previously sent, which included credit references of Bushman-related entities Bushman Family Farms, Bushman Organic Poultry, and Bushman Organic Grains.[4] Keith Smith's chief financial officer, Ron Fabian, followed upon on the credit references. West then traveled to Iowa on July 15, 2010, to meet Duane Bushman, Chad Bushman, and Stacy Bushman. While in Iowa, West viewed vacant barns belonging to Stacy and Chad and assumed these barns were where FGP chicks would be placed. He also viewed the facility that was to become CPP.

On July 20, 2010, Duane Bushman entered into a Hatching Egg Purchase Agreement with Keith Smith on behalf of FGP. West testified he did not know FGP had not yet been formed. The Keith Smith hatching agreement provided it would supply eggs on a weekly basis and invoices were due within twenty-one days of receiving the eggs. FGP would not receive any income for at least ten weeks, when the birds could be processed and sold. Over the course of about five months, Keith Smith shipped hundreds of thousands of eggs under the contract. Keith Smith was paid some $495,234 for the eggs provided to FGP but

---

[4] West testified he was under the impression that Duane Bushman's larger enterprise would be standing behind FGP because FGP had no credit references.

owed more than $248,000 on past due invoices.[5] FGP ceased its operations in January 2011. Also in January 2011, CPP went into involuntary bankruptcy.

West testified FGP did not inform Keith Smith that its invoices would not be paid. He stated:

> Well, I got promises and—Duane and Stacy both and Beth but—constantly promised that the processing plant would open at any time; but this investor, Bob Davis, his name and group came up in December of 2010, and we were told we would be paid in full and not to worry about—He was investing lots of money into the company and, you know, they would have the operating capital they needed to pay their bills and proceed.
> . . . .
> Q. Were you surprised to learn from Mr. Bushman's testimony yesterday that the investor was interested in investing in Custom Poultry and not Farmer Grown? A. I was a little surprised at that. Sure was.

The evidence also showed FGP was organized on August 6, 2010, and started doing business August 12, 2010. FGP was formed to "hatch out and grow chicken that would be sold to CPP that would be slaughtered." More specifically, it was FGP's plan that under the hatching agreement Keith Smith was to provide broiler hatching eggs to FGP every week. The eggs purchased by FGP from Keith Smith would be delivered to a hatchery, where the eggs would be hatched. From the hatchery, the chicks would be sold to Ag Point or other contract growers. The growers, including Ag Point, would then raise the chicks. When the chicks reached an appropriate weight, they would be shipped to CPP for processing. FGP would repurchase the birds grown by Ag Point before processing.

---

[5] S & C Organics made payments to Keith Smith after FGP ceased operations.

Though the owners of FGP, neither Duane nor Shirley Bushman provided any capital for the startup of FGP. FGP did not have any assets. It did not have employees. Its registered office was the residence of Duane and Shirley Bushman. FGP had no line of credit with a financial institution. FGP received monies from various Bushman-related entities to assist FGP in paying its bills during the five months FGP was in existence. These monies were recorded as loans in the books of both the paying entity and FGP. However, no promissory notes were signed; "there's no repayment terms, there's no term, there's nothing around repayment of the debt."

The monies received by FGP from Bushman-related entities were noted in its ledgers and include:

$2000 was received from Bushman Organic Poultry to FGP on August 12, 2010. Bushman Organic Poultry also paid expenses on behalf of FGP in the amount of $95,366.94 between August 2 and August 16, 2010, before FGP opened a checking account. Later, additional expenses aggregating approximately $48,500 were paid by Bushman Organic Poultry on behalf of FGP.

FGP received the sum of $108,000 from Ag Point on August 12, 2010. There were no specific terms on how the monies would be applied by FGP.

On November 15, 2010, Duane Bushman provided a personal guarantee of $600,000 on behalf of FGP for monies FGP owed to the grower, Ag Point.

A total of $253,909.53 was either posted as loans to FGP or invoices paid by Bushman Organic Farms for FGP between September 14, 2010, and February 4, 2011.

Paul Juffer, a certified public accountant with LWBJ, testified that as part of his business, he advised clients on "what's necessary to capitalize a business." Juffer was hired to analyze the capitalization of FGP. He testified that adequate capitalization for FGP would have been at least $1 million and opined FGP was not adequately capitalized. Juffer testified the infusion of payments from related-party entities was "ad hoc," made on an "emergency basis," and was not adequate as capital for the startup company. On cross-examination, Juffer was asked if CPP had been in a position to buy FGP's finished birds, the business model would have worked; that the problem was a lack of revenue from CPP and not a lack of capitalization. Juffer responded, "I think it's both. I think there—there was no capital to support the ramp up of the initial cost and any contingency that went with it."

Duane Bushman could not explain why the first three invoices from Keith Smith (totaling 160,000 eggs) were in Bushman Organic Poultry's name. Duane testified Ag Point was FGP's financial backer.[6] Ag Point was to make money on feeding the chicks out and by getting a certain amount per dressed meat after processing. When FGP ceased doing business in January 2011, it owed Ag Point $2.1 million.[7] Duane was asked:

Q. Who did Dan Volz report to, if not to you? A. Greg [DeWeese].

---

[6] Ag Point carried a substantial amount of the debt and financing related to the raising of the chicks, and it had not demanded immediate payment when the birds were sold back to FGP for processing.

[7] An account payable credit of $2.7 million was extended by Ag Point to FGP. As noted above, in November 2010, Duane Bushman gave Ag Point a personal guarantee on behalf of FGP in the amount of $600,000. The amount owed Ag Point was reduced to approximately $2.1 million when real estate owned by the Bushmans was sold in Minnesota and proceeds applied to the Ag Point debt.

Q. Greg was involved with Farmer Grown? A. Well, Greg kind of oversees everything in our business part of it; but you're asking about day-to-day management, you know, before, but Greg looks over—you know, he goes through our books.

Q. And that would be the case with all the companies? A. I—I think so. He—I don't—I don't—I don't know if he looks at Bushman Organic Poultry or not, because that's our personal farming operation.

Q. All the other companies we've talked about, Greg would be essentially the chief financial person? A. Yeah, he would—he would go through—I never title people, you know . . . .

Duane testified neither he nor Shirley read the certificate for organizing FGP. He acknowledged no promissory notes evidence loans to FGP. As for the $600,000 personal guarantee Duane made to Ag Point, it was a "gentlemen's agreement" that once the money owed to Ag Point by FGP reached $2 million, Duane and Shirley would "put this [Minnesota] farm [they] owned personally up to pay off $600,000 of that debt." When the farm was sold later in 2011 or 2012, Ag Point received the $600,000.

Duane Bushman testified he had no objections to Keith Smith checking the financial references provided by Beth Jones. "I would take for granted that they did. I mean, that's pretty normal."

Duane also testified as follows:

Q. We heard Mr. Juffer talk about the sole sources of revenues coming in to Farmer Grown. Is—is he right that the only sources of revenue were a combination of that Ag Point money that came out about three weeks after the egg was sold when you billed Ag Point and then, in addition to that, the money from a processor of a grown bird? A. Yeah, I think so.

Q. There wasn't any other source of money coming in? A. No, just those two.

Q. Okay. And—and is it fair to say that that money that came in from—from Ag Point was basically a wash because, when they sold that bird back to you, they got reimbursed exactly that money plus they got reimbursed that feed cost? A. No, but we had

a margin in there on the chicken; and plus we had a margin on the—on the—from CPP for doing this.

Q. Right. Your margin from CPP was a half a cent a pound of weight of that processed chicken;— A. Ah-huh.

Q. —correct? A. Again, I'd have to look at the thing because I'm going by what you just told me, and I don't know that for sure.

Q. Well,— A. But it sounds right.

Q. They paid you whatever cost you had into raising that bird plus a half a cent per pound in addition to that; right? A. That sounds right.

Q. And the cost that you had in that bird included a half a cent a pound that you were paying to Ag Point for the Ag Point birds; true? A. No, because we—Farmer Grown got the same amount of margin, I thought, as what Ag Point was getting. Farmer Grown should have had the same margin.

Q. True. But Ag Point gets that half a cent, and that half a cent is part of your cost that you're then getting a half a cent on; right? A. Yeah, so you're saying a penny total from CPP.

Q. A penny total. A. Yeah, there you go. Now, we're on the same page.

There were no formal projections made for FGP's startup. Duane testified:

I mean, we've been in the business long enough that you know the business. I mean, you know—I mean, I know what it cost to produce a pound of bird and—and what's a good feed, you know, efficiency, and you just know that; and so when you—you know, you do the calculations, it's not like you want to keep files of it and—so—

James Nalley, a business valuation consultant, was hired in 2013 by the

defendants. Nalley testified there are six factors that can constitute abuse of the

corporate privilege[8] and FGP had not violated any of them. He testified FGP

was adequately capitalized with the agreement with Ag Point in the way that the financing was going to be handled for the grow out of

---

[8] Nalley testified the six factors were:
  One is the corporation is undercapitalized; secondly, the corporation lacks separate books; thirdly, the corporation's finances are not kept separate from individual finances or individual obligations are paid by the corporation; fourth, the corporation is used primarily to promote fraud or illegality; fifth, the corporate formalities are not followed; and, six, the corporation is a mere sham.
These factors are referenced in our case law. *See Briggs Transp. Co. v. Starr Sales Co.*, 262 N.W.2d 805, 810 (Iowa 1978).

the poultry. Ultimately, in the end, due to other circumstances, that was not enough at that point and caused the demise of the company. But the initial capital structure seemed adequate for what they'd planned to do.

He testified FGP had a "separate set of books from the other entities that had some common ownership. They filed separate tax returns, and they have separate general ledgers." He opined the FGP operations were for a legitimate purpose and FGP had not abused the corporate privilege. On cross examination, Nalley was asked, "In the case of a failure of a business, is money coming in as borrowed money different than money coming in as infused for the ownership of the business?" Nalley responded, "Yes, it is. . . . For an unsecured creditor, the equity capital would be better for them."

> Q. And are you equating that the dollars that come in from debt financing as being capital because they're available to pay the bills of the business? A. They—they are capital in the sense for that reason, yes.
> Q. There's—there's another sense in which the term capital is used, though, is there not, as equating to contribution for the equity of a business? A. There is.
> Q. Okay. A. Again, capital can be both debt and equity, which is essentially what it was in this case.

The district court concluded FGP had breached its contract with Keith Smith and further found Duane and Shirley Bushman should be jointly and severally liable for the Keith Smith debt to FGP as the corporate privilege had been abused.

The Bushmans appeal the district court's decision to "pierce the corporate veil."

The district court, however, rejected the request to hold the other Bushman-related entities liable. FGP cross-appeals this aspect of the court's ruling.

**II. Scope and Standard of Review.**

We review a breach-of-contract action for correction of errors at law. *Iowa Mortgage Ctr.*, *L.L.C. v. Baccam*, 841 N.W.2d 107, 110 (Iowa 2013); *see* Iowa R. App. P. 6.907.

The findings of fact in a law action are binding upon us if supported by substantial evidence. Iowa R. App. P. 6.904(3)(a); *Baccam*, 841 N.W.2d at 110. The district court's legal conclusions and application of legal principles, however, are not binding on the appellate court. *See Baccam*, 841 N.W.2d at 110. If the district court has applied erroneous rules of law that materially affected its decision, we must reverse on appeal. *Land O'Lakes*, *Inc. v. Hanig*, 610 N.W.2d 518, 522 (Iowa 2000).

**III. Discussion.**

*A. Bushmans' appeal.* The Bushmans argue the district court's finding of fact that FGP was undercapitalized is not supported by the evidence. They also contend the court erred in piercing the corporate veil, characterizing the court's ruling as basing its decision to ignore the corporate entity on the single factor that FGP was undercapitalized.

A "limited liability company is an entity distinct from its members." Iowa Code § 489.104(1) (2009). The separate LLC entity enables LLC members to

limit their personal liability. *See id.* § 489.304.[9] "The separate corporate personality ordinarily enables corporate stockholders to limit their personal liability to the extent of their investment." *Briggs Transp. Co, Inc. v. Starr Sales Co.*, 262 N.W.2d 805, 809 (Iowa 1978); *see* Iowa Code § 489.403(1) (providing a "person's obligation to make a contribution[10] to a limited liability company is not excused by the person's death, disability, or other inability to perform personally. If a person does not make a required contribution, the person or the person's estate is obligated to contribute money equal to the value of the part of the contribution which has not been made, at the option of the company.").

But a company's separate entity—the "corporate veil"—may be "pierced" under some circumstances.

---

[9] Section 489.304 provides:

> 1. For debts, obligations, or other liabilities of a limited liability company, whether arising in contract, tort, or otherwise all of the following apply:
> a. They are solely the debts, obligations, or other liabilities of the company.
> b. They do not become the debts, obligations, or other liabilities of a member or manager solely by reason of the member acting as a member or manager acting as a manager.
> 2. The failure of a limited liability company to observe any particular formalities relating to the exercise of its powers or management of its activities is not a ground for imposing liability on the members or managers for the debts, obligations, or other liabilities of the company.

[10] Iowa Code section 489.102(2) defines "Contribution" as meaning:

> any benefit provided by a person to a limited liability company that is any of the following:
> (a) In order to become a member upon formation of the company and in accordance with an agreement between or among the persons that have agreed to become the initial members of the company.
> (b) In order to become a member after formation of the company and in accordance with an agreement between the person and the company.
> (c) In the person's capacity as a member and in accordance with the operating agreement or an agreement between the member and the company.

> A court may disregard a corporate structure by piercing the corporate veil only under circumstances "where the corporation is a mere shell, serving no legitimate business purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." *C. Mac Chambers Co. v. Iowa Tae Kwon Do Acad*[.], *Inc.*, 412 N.W.2d 593, 597 (Iowa 1987) (quoting *Briggs*[, 262 N.W.2d at 810]).
>
> The burden is on the party seeking to pierce the corporate veil to show the exceptional circumstances required. *C. Mac Chambers*, 412 N.W.2d at 598. Factors that would support such a finding include (1) the corporation is undercapitalized; (2) it lacks separate books; (3) its finances are not kept separate from individual finances, or individual obligations are paid by the corporation; (4) the corporation is used to promote fraud or illegality; (5) corporate formalities are not followed; and (6) the corporation is a mere sham. *Id.* (citing *Briggs*, 262 N.W.2d at 810).

*In re Marriage of Ballstaedt*, 606 N.W.2d 345, 349 (Iowa 2000). This list is not meant to be exhaustive, but to act as a guideline. *Boyd v. Boyd & Boyd*, 386 N.W.2d 540, 544 (Iowa Ct. App. 1986). Generally, to pierce the corporate veil, the circumstances must indicate that to do otherwise would sanction a fraud or promote injustice. *Id.* (citing 1 Fletcher Cyc. Corp. § 41.30).

In *Briggs*, the court addressed undercapitalization as follows:

> If a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable that shareholders should set up such a flimsy organization to escape personal liability. The attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity and will be ineffectual to exempt the shareholders from corporate debts. It is coming to be recognized as the policy of the law that shareholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for its prospective liabilities. If capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege.

262 N.W.2d at 810 (quoting Henry W. Ballantine, *Ballantine on Corporations*, § 129 (rev. ed. 1946)).

The *C. Mac Chambers Co.* case dealt with a closely held corporation, which failed and was immediately supplanted by a separate corporation. Both were owned and operated by members of the same family. 412 N.W.2d at 595. Creditors of the failed corporation brought actions on several theories, seeking to recover against the succeeding corporation and the family member who was its sole shareholder and director. *Id.* The supreme court upheld the district court's ruling of individual liability, noting:

> At no time did Ki Tae Kim offer any consideration for his 1000 shares of stock in Academy II and by his own admission he made no capital contribution to the venture. As stated in *Briggs,* shareholders will not escape personal liability by setting up a corporation which does not have sufficient assets available to meet its debts. 262 N.W.2d at 810. We also note that individual obligations of the Kim family were routinely paid by both corporations and Kim family finances were not kept separate from corporate accounts.

*Id.* at 598.

Whether the corporate privilege has been abused is a question of fact. *See Adam v. Mt. Pleasant Bank & Trust Co.*, 355 N.W.2d 868, 872 (Iowa 1984) (subscribing to court of appeals opinion as to generation of fact questions). And the district court's findings of fact are binding upon us if supported by substantial evidence. Iowa R. App. P. 6.904(3)(a). Evidence is substantial when a reasonable mind could accept it as adequate to reach the same findings. *Waukon Auto Supply v. Farmers & Merchants Sav. Bank*, 440 N.W.2d 844, 846 (Iowa 1989). Evidence is not insubstantial merely because it would have supported contrary inferences and, in case of doubt or ambiguity we construe the court's findings of fact to uphold rather than defeat, the judgment. *Grinnell Mut. Reins. Co. v. Voeltz*, 431 N.W.2d 783, 785 (Iowa 1988).

The trial court made a finding that the hatching agreement was signed *before* formation of FGP. Moreover,

> Prior to forming Farmer Grown, Duane Bushman did not prepare any written analysis of the prospective capital needs of Farmer Grown. Farmer Grown did not secure any line of credit from a bank or other lender. Although Duane Bushman did not prepare any written analysis of the prospective capital needs of Farmer Grown, Bushman testified he did a projection of expenses and profits in his head. He testified he made some notes; however, he no longer has those notes.
>
> Farmer Grown did not have any employees. Its registered office with the Iowa Secretary of State was the residence of Duane and Shirley Bushman. Ultimately, the business operations of Farmer Grown were moved to office space located in a barn at Ft. Atkinson, Iowa. Business operations of several other Bushman-related entities are conducted in this same barn.
>
> Farmer Grown Poultry received advances from various Bushman-related companies so Farmer Grown could pay its bills during the five months it was in existence. These advances were recorded as loans and reflected in the records of both the lender and Farmer Grown. No promissory notes were, however, signed. . . .
>
> Farmer Grown received $2000 from Bushman Organic Poultry as a loan. The sum of $253,910 was loaned to Farmer Grown by Bushman Organic Farms. Farmer Grown Poultry received the sum of $108,000 from Ag Point. This was a prepayment against invoices when chicks were sold by Farmer Grown Poultry to AgPoint. There were no specific terms on how the monies would be applied by Farmer Grown. . . . Bushman Organic Poultry paid Farmer Grown Poultry's payables aggregating $95,366.94 prior to Farmer Grown opening a checking account. Later, additional expenses aggregating approximately $48,500 were paid by Bushman Organic Poultry on behalf of Farmer Grown. For a while, Farmer Grown's bills were paid by Bushman-related entities on an as-needed basis.

While finding nothing "improper" about a business being financed through debt financing, the trial court noted, "The historical business practice for the Bushman-related entities has been to move cash from a centralized account to the entity that needed it to pay for operating expenses and/or fund losses." The court also noted Juffer's opinion that at least $1 million was needed to fund the

anticipated business of FGP "at its inception." The trial court found that when Keith Smith requested financial information, it was provided financial statements for *Bushman-related entities*. The court also found:

> Even though Farmer Grown Poultry's anticipated business cycle (time when eggs were acquired and turned into cash) was approximately 10 weeks, there was no capital infused into Farmer Grown Poultry's operation, beyond the $2000 loaned from Bushman Organic Poultry. Farmer Grown Poultry needed capital to fund the egg purchases from Keith Smith, to pay the hatcheries, to pay barn owners, and to expand operations. Since Farmer Grown Poultry was not adequately capitalized, Bushman Organic Farms loaned additional monies to Farmer Grown Poultry and Bushman Organic Poultry paid certain operating expenses and costs for Farmer Grown Poultry on an as-needed basis.
> Farmer Grown Poultry's business cycle was 10 weeks; however, Keith Smith was entitled to payment within three weeks of each delivery. Capital was needed to fund the initial purchases of hatching eggs, in addition to other start-up costs. That capital was lacking.

These findings are supported by substantial evidence and do not relate only to the inadequacy of the capitalization of FGP.

We point out the Bushmans' history of moving funds between related entities, and the lack of FGP assets and employees, and its failure to reduce losses to Keith Smith despite knowing its funding was inadequate. We note, too, Duane and Shirley Bushman did not read the operating agreement and offered no consideration for their ownership of FGP. *Cf.* Harvey Gelb, Piercing the Corporate Veil, 59 Chi.-Kent L. Rev. 1, 13 (1982) (noting the caution with which court's should pierce the corporate veil due to "resulting chilling effect on *investment*" (emphasis added)). There were no assets available to meet the debts of FGP. However, Bushman-related entities paid FGP's obligations for a time. *See C. Mac Chambers*, 412 N.W.2d at 595. The financial life of FGP was

entirely dependent upon the goodwill of the related Bushman entities and nearly all of the related entities had a different ownership arrangement than FGP. Additionally, submitting the financial statements of the Bushman-related entities certainly suggested, as West opined, that the other related-entities would stand behind FGP, and is strong evidence that equity should intervene to pierce the corporate veil.

We acknowledge that perhaps best practices would have suggested that Keith Smith obtain a personal guarantee from one or both of the Bushmans. But Keith Smith was provided the financial information of the other Bushman entities and had no reason to suspect that they would not amply capitalize this L.L.C. because the information provided suggested the other entities' financial status were sound.

The district court concluded:

> In the instant case, neither Duane Bushman nor Shirley Bushman provided any capital whatsoever for the start up of Farmer Grown Poultry. Its only revenue was a $2000 loan from a Bushman-related entity. As debts were incurred, Bushman-related entities would lend money to Farmer Grown Poultry for payment on its debts. Farmer Grown Poultry did not have any assets itself. Duane Bushman entered into a contract with Keith Smith, on behalf of Farmer Grown Poultry, to purchase hatching eggs. He entered into a contract that provided payment would be made to Keith Smith within 21 days of receiving the eggs. However, Farmer Grown Poultry, at best, would not receive any income for at least 10 weeks, when the birds could be processed and sold. Farmer Grown Poultry continued to accept eggs from Keith Smith in spite of the fact Custom Poultry Processing failed to become operational until December 2010. Farmer Grown made no attempt to request Keith Smith stop egg deliveries and seek another purchaser. This could have reduced Keith Smith's loss.
> The Court concludes the "corporate veil" of Farmer Grown Poultry, a limited liability company owned by Duane Bushman and Shirley Bushman, should be pierced and personal liability be imposed on Duane Bushman and Shirley Bushman.

The court's conclusions support a finding that adherence to the corporate structure would promote an injustice to the creditor Keith Smith. We affirm on the appeal.[11]

*B. Keith Smith's cross-appeal.* Keith Smith asserts in its cross-appeal that the district court erred in failing to find it had proved the other Bushman-related entities named as defendants were alter egos of FGP. The trial court ruled:

> With regard to Bushman-related entities, Defendants Bushman Organic Grains, Inc., Bushman Organic Farms, Inc., f/k/a Bushman Family Farms, Bushman Organic Poultry, and Organic Feed & Grains, LLC, the Court finds neither the credible evidence nor pertinent law supports entry of judgment against these Defendants. They were not involved in the creation of Farmer Grown Poultry; they operated separately from Farmer Grown Poultry. These entities had no obligation to provide sufficient capital to Farmer Grown Poultry.

We add that although family members were involved as owners of these entities, the ownership structure differed.

Viewing the evidence in the light most favorable to upholding the judgment, we conclude the court's findings of separateness are supported by substantial evidence. We affirm on the cross-appeal.

**AFFIRMED ON BOTH APPEALS.**

Mullins, J., concurs; McDonald, J., concurs in part and dissents in part.

---

[11] Unlike the dissent, we do find this is one of the exceptional cases where the corporate veil should be pierced. We acknowledge that not all of the *Briggs* factors exist, but this is not a case of undercapitalization but rather of no capitalization. The related corporations provided a funding stream until the rug was pulled out from under Keith Smith by the related corporations refusing to continue the funding stream and the corporation never being adequately capitalized.

**MCDONALD, Judge.** (concurring in part and dissenting in part)

I concur in the majority's resolution of Keith Smith Company's cross-appeal. There is no basis to impose liability under an "alter ego" theory. I respectfully dissent from the majority's resolution of the "veil piercing" issue.

I begin with the standard of review. Controlling case law holds the question of whether the corporate veil should be pierced is one at law to be decided by the jury. *See Team Cent., Inc. v. Teamco, Inc.*, 271 N.W.2d 914, 923 (Iowa 1978) ("We mention briefly Team Central's additional argument that whether or not the corporate veil should be pierced is a question of law to be decided by the court, not the jury. We do not believe that this is a correct statement and several of our cases hold otherwise."); *Spectrum Prosthetics & Orthotics, Inc. v. Baca Corp.*, No. 08-0811, 2009 WL 3337600, at *4 (Iowa Ct. App. Oct. 7, 2009) (holding jury instruction was required where there was sufficient evidence to support at least one *Briggs* Factor). No satisfactory rationale has been given for the rule. Upon closer examination, the question of veil piercing should be an equitable determination for the court subject to de novo review rather than a question at law subject to the correction of legal error. *See Minger Constr. Inc. v. Clark Farms, Ltd.*, No. 14-1404, 2015 WL 7019046, at *4-9 (Iowa Ct. App. Nov. 12, 2015) (McDonald, J., dissenting); *D.R. Horton Inc. v. Dynastar Dev., L.L.C.*, No. MER-L-1808-00, 2005 WL 1939778, at *22 (N.J. Super. Ct. Aug. 10, 2005) ("Indeed, piercing the veil is an equitable remedy, in derogation of the statute limiting liability."); *Nw. Cascade, Inc. v. Unique Constr., Inc.*, 351 P.3d 172, 182 (Wash. Ct. App. 2015) ("Veil piercing is an equitable remedy imposed to rectify an abuse of the corporate privilege"). The controlling

standard of review is not dispositive of the claim in this case. Substantial evidence review "does not preclude inquiry into the question whether, conceding the truth of the facts found, a conclusion of law drawn therefrom is correct, nor are we bound by [the] trial court's determination of the law." *Briggs Transp. Co. v. Starr Sales Co.*, 262 N.W.2d 805, 811 (Iowa 1978).

A court should impose personal liability on a member of an LLC for the LLC's obligations only in the most exceptional of circumstances. *See C. Mac Chambers Co., Inc. v. Iowa Tae Kwon Do Acad., Inc.*, 412 N.W.2d 593, 597 (Iowa 1987). "Plaintiffs bear the burden of proving that exceptional circumstances exist which warrant piercing the corporate veil." *Id.* at 598*.* The burden is significant. *See HOK Sport, Inc. v. FC Des Moines, L.C.*, 495 F.3d 927, 935 (8th Cir. 2007) (applying Iowa law and stating that "[d]isregarding the entity's corporate form under either the alter ego doctrine or the remedy of piercing the corporate veil is an extraordinary measure that should be reserved for exceptional circumstances, . . . and the party seeking to do so bears the burden of proof"); *see also Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) ("Persuading a Delaware court to disregard the corporate entity is a difficult task."); *Morgan v. O'Neil*, 652 S.W.2d 83, 85 (Ky. 1983) ("Holding a shareholder in a corporation individually liable for a corporate debt is an extraordinary procedure and should be done only when the strict requirements for imposing individual liability are met."); *TNS Holdings, Inc. v. MKI Sec. Corp.*, 703 N.E.2d 749, 751 (N.Y. 1998) (stating that "[t]hose seeking to pierce a corporate veil . . . bear a heavy burden"). It is not material whether the legal entity is a corporation or an LLC. *See* Iowa

Code § 4.1(20) ("'[P]erson' means an individual, corporation, limited liability company, government or governmental subdivision or agency, business trust, estate, trust, partnership or association, or any other legal entity."). In both cases, limited liability is the presumptive rule. *See id.* § 489.304(1); *Wyatt v. Crimmins*, 277 N.W.2d 615, 616 (Iowa 1979); 5 Matthew Doré, *Iowa Practice Series*: *Business Organizations* § 15.3(1), at 454 (2014-2015) (stating limited liability is the presumptive rule).

Keith Smith has not carried its heavy burden of establishing this is one of the exceptional cases in which the statute providing for limited liability should be disregarded and personal liability imposed on the members of the LLC. The *Briggs* factors do not support the imposition of personal liability on the Bushmans. FGP maintained financial records separate from the Bushmans. FGP maintained financial records separate from the related Bushman entities. FGP maintained separate finances from the Bushmans. For example, there is no evidence FGP paid the Bushmans' personal obligations. There is no evidence FGP was used to promote fraud or illegality. Because the entity at issue is an LLC, it is largely immaterial whether FGP followed formalities. *See* Iowa Code § 489.304(2) ("The failure of a limited liability company to observe any particular formalities relating to the exercise of its powers or management of its activities is not a ground for imposing liability on the members or managers for the debts, obligations, or other liabilities of the company."). There is no evidence the entity was a mere sham. To the contrary, FGP was created to execute a specific business plan. While FGP failed and breached its contract with Keith Smith, the mere failure to perform a contract is an insufficient reason to impose personal

liability on the Bushmans for FGP's obligations. *See Campisano v. Nardi*, 562 A.2d 1, 7 (Conn. 1989) (holding the mere breach of a corporate contract cannot of itself establish the basis for imposing personal liability). The sole basis on which the district court imposed liability was its finding of undercapitalization. However, "[i]nadequate capitalization, by itself, rarely leads to disregard of the corporate entity." 5 Matthew Doré, *Iowa Practice Series*: *Business Organizations* § 15.4; *see In re BH S & B Holdings L.L.C.*, 420 B.R. 112, 136 (Bankr. S.D.N.Y. 2009), *aff'd as modified*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011) ("As an initial matter, undercapitalization is rarely sufficient to pierce the corporate veil, because otherwise the veil of every insolvent subsidiary or failed start-up corporation could be pierced."); Jeffrey K. Vandervoort, *Piercing the Veil of Limited Liability Companies: The Need for A Better Standard*, 3 DePaul Bus. & Com. L.J. 51, 73 (2004) ("Finally, it is important to note that undercapitalization has rarely been found to be sufficient by itself to pierce the veil.").

The majority opinion ignores the most important factors relevant to Keith Smith's request to impose liability on the Bushmans: whether the parties had the opportunity to negotiate and allocate the risk of loss prior to the time of contract and, if so, whether there is any reason to disturb the bargained-for allocation of loss. The answer to the former question is yes; the answer to the latter question is no. The parties are sophisticated players in the agribusiness industry with equal bargaining power. They engaged in an arms-length commercial transaction. Prior to the parties entering into the purchase agreement, Keith Smith conducted due diligence. Keith Smith's representatives met with the Bushmans and toured several of the facilities to be used in the processing

operations. At Keith Smith's request, the Bushmans provided Keith Smith with financial statements and credit references. The Bushmans did not make any misrepresentations in the financial statements. The financial statements and credit references were explained to and reviewed by Keith Smith's chief financial officer, Ron Fabian, and by the account manager, Bud West. The financial statements showed FGP had no material assets in light of the endeavor to be undertaken. West testified he knew FGP was a "start-up." The majority's distinction that liability should be imposed here because this is a case of "no capitalization" versus inadequate capitalization, *ante* at 20 n.11, is thus immaterial. Keith Smith's representatives testified that Keith Smith knew, at the time of contract, FGP was a newly-formed entity without any assets. Nonetheless, Keith Smith chose to enter into the purchase agreement with FGP only. Keith Smith did not request personal guaranties from the Bushmans. Keith Smith did not request guaranties from any of the other Bushman entities. Keith Smith did not request collateral or any other security from the Bushmans or any of the Bushman entities. After the parties started performing under the purchase agreement, FGP immediately fell behind in its payments. Keith Smith nonetheless continued to sell product to FGP without seeking additional security. Under these circumstances, there is no reason to reallocate the risk of loss contrary to the parties' agreement.

Generally, "[c]ourts are more willing to disregard the corporate veil in tort than in contract cases. The rationale for this distinction follows directly from the economics of moral hazard—where corporations must pay for the risk faced by creditors as a result of limited liability, they are less likely to engage in activities

with social costs that exceed their social benefits." Frank H. Easterbrook, *Limited Liability and the Corporation*, 52 U. Chi. L. Rev. 89, 112 (1985). "Contract creditors, in other words, are compensated ex ante for the increased risk of default ex post." *Id.* As one court explained:

> PRES points out, however, that in a number of contexts PRES did negotiate personal guarantees from Michaelson, and insists that such guarantees weaken MPI's corporate veil. We think, to the contrary, that they fortify it. Courts have been extraordinarily reluctant to lift the veil in contract cases, such as this one, where the creditor has willingly transacted business with the corporation. In other words, courts usually apply more stringent standards to piercing the corporate veil in a contract case than they do in tort cases. This is because the party seeking relief in a contract case is presumed to have voluntarily and knowingly entered into an agreement with a corporate entity, and is expected to suffer the consequences of the limited liability associated with the corporate business form, while this is not the situation in tort cases. Thus, in contract cases, where each party has a clear and equal obligation to weigh the potential benefits and risks of the agreement, courts have emphatically discouraged plaintiffs seeking to disregard the corporate form. In such cases, courts have required proof of some form of misrepresentation to the creditor: Unless the [corporation] misrepresents its financial condition to the creditor, the creditor should be bound by its decision to deal with the [corporation]; it should not be able to complain later that the [corporation] is unsound. . . . Absent some evidence of misrepresentation, courts should not rewrite contracts or disturb the allocation of risk the parties have themselves established. Parties to a commercial transaction must be free to negotiate questions of limited liability and to enforce their agreements by recourse to the law of contracts. . . . As a matter of contract, then, Michaelson was entitled to insulation from personal liability on the claims from the AAA partners, and it is not our place to restructure the parties' agreement. From the outset, MPI was a limited liability corporation formed for the express purpose of entering joint ventures in real estate. The parties in this case expressly put the issue of limited liability on the bargaining table, and settled on an agreement that required MPI—not Aaron Michaelson—to answer for the debts of the partnership. Exceptions to this rule were plainly spelled out by the parties in writing. The jury verdict stripped Michaelson of the protections against personal liability to which he was entitled under the settled corporate law of Virginia. It awarded to PRES a new contract—one that bestowed on PRES a personal guarantee on the

part of Michaelson that PRES had been unable to obtain at the bargaining table—apparently on the ground that the actual agreement resulted in a "fundamental unfairness." Be that as it may, Virginia law plainly says that fairness is for the parties to the contract to evaluate, not the courts. Our task is rather one of enforcement. In conclusion, PRES is a disconsolate joint venturer who now wishes it had been doing business with an individual, and not a corporation. That was not the case, however, and, for the foregoing reasons, we reverse and remand with directions that the district court enter judgment for defendant Michaelson.

*Perpetual Real Estate Servs., Inc. v. Michaelson Props., Inc.*, 974 F.2d 545, 550-51 (4th Cir. 1992) (internal citations omitted).

I would hold personal liability should not be imposed on members of an LLC for the LLC's obligations on the basis of inadequate capitalization of the LLC where the judgment creditor's claim arises in contract, where the judgment creditor had the opportunity to obtain financial statements and other credit information prior to entering the contract, where the judgment creditor had the opportunity to price and allocate the risk of loss by requesting personal guaranties or other security, and where the judgment creditor failed to do so. *See, e.g.*, *Se. Texas Inns, Inc. v. Prime Hosp. Corp.*, 462 F.3d 666, 681 (6th Cir. 2006) (holding plaintiff failed to state a claim where it was a "consensual contract setting in which sophisticated parties negotiated and entered into the Lease with full knowledge of its terms"); *Browning-Ferris Indus. of Illinois, Inc. v. Ter Maat*, 195 F.3d 953, 960 (7th Cir. 1999) (stating "it is hard to see how a voluntary creditor can complain if he knows that his debtor lacks sufficient assets to be certain to be able to pay the debt when it comes due"); *Kinney Shoe Corp. v. Polan*, 939 F.2d 209, 212 (4th Cir. 1991) ("If such an investigation would disclose that the corporation is grossly undercapitalized, based upon the nature and the

magnitude of the corporate undertaking, such party will be deemed to have assumed the risk of the gross undercapitalization and will not be permitted to pierce the corporate veil."); *United States v. Jon-T Chems., Inc.*, 768 F.2d 686, 693 (5th Cir. 1985) ("In a contract case, the creditor has willingly transacted business with the subsidiary. If the creditor wants to be able to hold the parent liable for the subsidiary's debts, it can contract for this. Unless the subsidiary misrepresents its financial condition to the creditor, the creditor should be bound by its decision to deal with the subsidiary; it should not be able to complain later that the subsidiary is unsound."); *D.R. Horton Inc.*, 2005 WL 1939778, at *29 ("In the contract setting, at least one not involving an unsophisticated consumer, it may be presumed that the parties are aware that they are dealing with limited liability entities. They have decided to allocate the risk of non-performance and limited liability among themselves. Indeed, often, a creditor dissatisfied with the limited liability of a closely held corporation may seek a personal guarantee, raise its price, or simply choose not to do business with the corporation."); *Theberge v. Darbro, Inc.*, 684 A.2d 1298, 1301 (Me. 1996) ("When the plaintiff attempts, in the context of a contractual dispute, to pierce the corporate veil, courts generally apply more stringent standards because the party seeking relief in a contract case is presumed to have voluntarily and knowingly entered into an agreement with a corporate entity, and is expected to suffer the consequences of the limited liability associated with the corporate business form."); *Truckweld Equip. Co. v. Olson*, 618 P.2d 1017, 1022 (Wash. Ct. App. 1980) (refusing to impose liability where creditor made no effort to obtain personal guarantee or timely file chattel liens and stating it was the creditor's "failure to utilize these safeguards which

contributed to its loss, not any misconduct or abuse of the corporate form"); *Bostwick-Braun Co. v. Szews*, 645 F. Supp. 221, 227 (W.D. Wis. 1986) ("Estoppel would appear to be established here by virtue of plaintiff's unexercised right to ascertain the capital structure of the BENNS Corporation coupled with the defendants' continued purchases of merchandise from plaintiff in the corporation's name."); Law of Corp. Offs. & Dirs.: Rts., Duties & Liabs. § 20:7 (2015) ("In contract cases, in the absence of fraud or misrepresentation, the creditor may be said to have accepted the risk of limited liability in dealing with a corporation."); Robert W. Hamilton, *The Corporate Entity*, 49 Tex. L. Rev. 979, 984 (1971) ("Secondly, a major consideration in determining whether the shareholders or the third party should bear the loss is whether the third party dealt voluntarily with the corporation or whether he is an involuntary creditor . . . . In a contract case, the plaintiff has usually dealt in some way with the corporation and should be aware that the corporation lacks substance. In the absence of some sort of deception, the creditor more or less assumed the risk of loss when he dealt with a 'shell'; if he was concerned, he should have insisted that some solvent third person guarantee the performance by the corporation."). I would reverse the district court's imposition of liability against the Bushmans in their personal capacity.

For all these reasons, I respectfully concur in part and dissent in part.